**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Robert Charles Class A, L.P., on behalf of itself and all others similarly situated,     ) | ) |
|                 ) | Case No.: _____ |
|           Plaintiff,       ) | |
|                 ) | |
|     v.               ) | |
|                 ) | **CLASS ACTION COMPLAINT** |
| Bank of America Corporation; Bank of America, N.A.; Barclays Bank Plc;   ) | |
| Barclays Capital, Inc.; Citigroup, Inc.;   ) | |
| Citibank, N.A.; HSBC Holdings plc;   ) | |
| HSBC Bank plc; HSBC North America   ) | **JURY TRIAL DEMANDED** |
| Holdings Inc.; HSBC Bank USA, N.A.;   ) | |
| J.P. Morgan Chase & Co.; J.P. Morgan   ) | |
| Chase Bank, N.A.; The Royal Bank of   ) | |
| Scotland Group plc; The Royal Bank of   ) | |
| Scotland plc; UBS AG; and UBS Securities LLC;   ) | |
|                 ) | |
|           Defendants.      ) | |
| _____ ) | |

Plaintiff, individually and on behalf of a class of all others similarly situated, brings this action pursuant to the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. §§ 1, et seq., the Sherman Act, 15 U.S.C. § 1, and the Section 4 of the Clayton Act, 15 U.S.C. § 15.

## INTRODUCTION

1.      Plaintiff traded in exchange-traded foreign exchange ("FX") futures contracts and options on FX futures contracts. Plaintiff seeks recovery of damages on behalf of itself and other similar investors that transacted in exchange-traded foreign exchange ("FX") futures contracts and/or options on FX futures contracts at artificial prices as the result of Defendants' manipulation of the $5 trillion-a-day FX spot market—the largest asset class in the world.

2.      The prices of FX Futures are tied directly to the FX spot market (also known as cash market) currency prices.[1] Changes in spot market prices are immediately and correspondingly reflected in FX Futures prices. As such, manipulation of the FX spot market is also a manipulation of the FX Futures prices.

3.      As described herein, each of the Defendants is a global bank that deals in foreign currency and that, among other things, actively manipulated the FX spot market through tactics such as "front running/trading ahead," "banging the close," and "painting the screen."

4.      One of the primary FX benchmark rates to which Defendants directed their manipulation was the WM/Reuters Rates (also known as the WM/Reuters London Fix). The WM/Reuters Rate is the most important FX benchmark rate and its integrity therefore is critical to the integrity of the markets in the U.S. and around the world, including the market for FX futures contracts and options on FX futures contracts.

5.      As dominant and sophisticated FX market participants, Defendants knew to a substantial certainty that their active and intentional manipulation of FX spot prices and FX benchmark rates would and did directly cause artificial and manipulated FX Futures prices during the Class Period. Defendants knowingly engaged in illegal manipulation of FX cash market prices, while fully comprehending, and therefore specifically intending, the certain consequences of that active price manipulation in the FX Futures market. Such consequences were thus fully and certainly foreseeable, as was the corresponding harm and injury to Plaintiff and those similarly situated, and Defendants thus knowingly, intentionally, and/or recklessly caused such harm and injury. Upon information and belief, FX Futures price manipulation,

---

[1] "A spot or outright currency transaction is simply the exchange of one currency for another, at the current or spot rate." CME Group, Understanding FX Futures 2 (Apr. 22, 2013).

[2] Press release available at: http://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.

including Defendants' manipulation of the WM/Reuters Rate, occurred throughout the Class Period.

6.      In recent weeks and months certain of the Defendants have pled guilty to criminal charges brought by U.S. and foreign regulators and/or agreed to pay billions of dollars in fines arising from their manipulation of the FX spot market and benchmark rates.

7.      Most recently, on May 20, 2015, Citigroup Inc., J.P. Morgan Chase & Co., Barclays Plc, and Royal Bank of Scotland Plc plead guilty to United States Department of Justice felony charges charging the banks with conspiring to manipulate the price of U.S. Dollars and Euros on the FX spot market.  Together, these banks agreed to pay more than $2.5 billion in criminal fines in relation to their guilty pleas.  These banks, along with UBS, also paid fines to the Federal Reserve amounting to more than $1.6 billion. *See* Department of Justice, Office of Public Affairs Press Release, "Five Major Banks Agree to Parent-Level Guilty Pleas" (May 20, 2015).[2]

8.      All told, Defendants have paid more than $5.8 billion to date in criminal and civil fines and penalties as a result of their misconduct with respect to the manipulation of the FX spot market, including specifically the WM/Reuters London Fix.

9.      Plaintiff and the members of the Class were injured in the same manner, and as a result of the same misconduct, as traders in the FX spot market.

10.      Plaintiff's allegations are based upon personal knowledge and upon information and belief as to all other matters alleged herein, including the investigation of counsel from publicly-available sources of information, press reports, and regulatory and court filings. Except as alleged in this Complaint, Plaintiff and other class members do not have access to the

---

[2] Press release available at: http://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.

underlying facts relating to Defendants' improper activities, as that information is known only to Defendants and lies exclusively within their possession and control, their co-conspirators and other insiders. Plaintiff believes that further evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## JURISDICTION AND VENUE

11.   Plaintiff brings this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25; Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, respectively.

12.   This Court has subject matter jurisdiction pursuant to Section 22 of the CEA, 7 U.S.C. § 25; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a); and 28 U.S.C. §§ 1331 and 1337.

13.   This Court has personal jurisdiction over each of the Defendants, as each Defendant transacts business, commerce and trading in the United States and in the Southern District of New York, including, on information and belief, trading FX spot and related contracts during periods of price manipulation alleged herein. Each Defendant also has substantial contacts with the United States, including this District, and engaged in multiple acts in furtherance of their conspiracy in the United States, including engaging in manipulative spot FX transactions and, at times, FX Futures transactions with traders and clients based in the United States, including this District.

14.   Venue is proper in this District pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d). Defendants each transacted business in, had agents in, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendants were subject to the laws and regulations

of the United States and its agencies, and their employees and agents entered into unlawful acts and agreements in furtherance of their market manipulation and restraint of trade in the United States and caused substantial effects in the United States.

15.      Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce in connection with the unlawful acts and practices and courses of business alleged in this Complaint. Currency, FX and related futures and options contracts are commodities that trade in interstate commerce in the United States. Defendants are all sophisticated FX dealers and market participants that knew that FX spot prices and benchmarks are disseminated in the United States and are directly and immediately incorporated into the trading and settlement prices of FX Futures traded on centralized U.S. exchanges (the "Relevant Exchanges"), including but not limited to the CME Group Exchanges, including Chicago Mercantile Exchange, Inc. ("CME"), and ICE Futures U.S. Exchanges ("ICE").

## THE PARTIES

16.      Plaintiff Robert Charles Class A, L.P. ("RCA") is a California Limited Partnership, who at all relevant times maintained its principal place of business in San Diego, California. Plaintiff RCA transacted in FX Futures during the Class Period, including the purchases and sales of Euro/U.S. Dollar futures contracts on the CME, including around the time of the 4 p.m. London Fix and/or the 2:00 p.m. CT CME Daily Settlement Fix (described below), at artificial prices that were caused by Defendants' unlawful conduct, resulting in injury to its business or property by reason of Defendants' violations of law, as alleged herein.

17.      Defendant Bank of America Corporation ("BAC") is a Delaware corporation with its headquarters at Bank of America Corporate Center, 100 North Tryon Street, Charlotte, North

Carolina. BAC's investment banking division in located at the Bank of America Tower, One Bryant Park, 1111 Avenue of the Americas, New York, New York. BAC, through *inter alia* its Global Banking and Global Markets business segments, is a significant FX market participant and has been subject to investigation by U.S. public regulatory entities arising from its involvement in the manipulation of FX benchmark rates.

18.     Defendant Bank of America, N.A. ("BofA") is a federally chartered national banking association headquartered at 100 North Tryon Street, Charlotte, North Carolina, and is an indirect, wholly owned subsidiary of BAC. BofA engages in the FX business, acting as a dealer in the spot FX market and providing liquidity in G10 currencies by acting as a principal market maker, and by trading with other dealers and customers to seek profits for BofA.

19.     Plaintiff refers herein to BAC and BofA collectively as "Bank of America."

20.     Defendant Barclays Bank Plc ("Barclays") is a public limited company headquartered in London, England. Barclays has substantial operations in the United States, including in this District. In particular, Barclays' New York branch, located at 745 Seventh Avenue, New York, New York, is licensed by the New York State Department of Financial Services. Barclays is registered as a financial holding company with the Federal Reserve Bank of New York and is subject to a comprehensive regulatory structure in the United States.

21.     Barclays also has Representative Offices in the United States, including in New York, through which Barclays engages in investor relations and interacts with and provides information about Barclays to its clients located in the United States. Barclays also maintains a foreign representative office at One MetLife Plaza, 2701 Queens Plaza North, Long Island City, New York.

22.     Barclays employs hundreds of traders and other employees in New York, with its New York branch reporting total assets of $36 billion. Barclays operates a spot FX trading desk in New York, with voice operations connected to traders on Barclays' London spot FX trading desk.

23.     Defendant Barclays Capital, Inc. ("BarCap") is incorporated in the State of Connecticut and is a subsidiary of Defendant Barclays. BarCap is headquartered in New York, with numerous domestic branch offices throughout the United States. BarCap engages in investment banking, wealth management, and investment management services. BarCap is a member of the CME and other U.S. exchanges.

24.     Plaintiff refers herein to Defendants Barclays and BarCap collectively as "Barclays."

25.     Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation with its headquarters located at 399 Park Ave, New York, New York.

26.     Defendant Citibank, N.A. ("Citibank") is federally-chartered national banking association headquartered at 399 Park Avenue, New York, New York. Citibank is a wholly owned subsidiary of Defendant Citigroup, Inc. In its 2013 Annual Report, Citigroup disclosed that its revenues from FX trading activities generated $2.224 billion from FX spot, forward, option and swap contracts, as well as FX translation gains and losses.

27.     Plaintiff refers herein to Defendants Citigroup and Citibank collectively as "Citigroup."

28.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company headquartered in London. HSBC Holdings and its subsidiaries provide services in HSBC Holdings' network covering 73 countries and territories organized into

geographic regions, with thousands of employees in the U.S. For the year ended December 31, 2013, HSBC disclosed $8.8 billion in revenue and $1.221 billion in profit before tax in North America alone. HSBC's ADRs are traded on the NYSE.

29.    Defendant HSBC Bank plc ("HSBC") is a United Kingdom public limited company headquartered in London and is a wholly owned subsidiary of HSBC Holdings. HSBC's Global Banking and Markets business houses its Global FX and Commodities business. HSBC's core business lines in the United States include Global Markets FX, which provides services in FX spot, forwards, swaps and other related derivatives. HSBC's London G10 FX trading desk is part of the Global FX and Commodities business. New York serves as a hub for HSBC's Global Markets in the United States, delivering international products to U.S. clients. HSBC's affiliate, HSBC Securities (USA) Inc. is a registered broker-dealer with the SEC and a registered Futures Commission Merchant with the CFTC and engages in trading debt and equity securities, including as a primary dealer of US government and government agency securities, and futures contracts.

30.    Defendant HSBC North America Holdings Inc. ("HSBC Holdings N.A.") is a Delaware corporation headquartered in New York, and is a wholly owned subsidiary of HSBC Holdings plc. Defendant HSBC Holdings N.A. is the holding company for HSBC Holding's operations in the U.S.

31.    Defendant HSBC Bank USA, N.A. ("HSBC US"), is a national banking association with its principal place of business located at 452 Fifth Avenue, New York, New York, and is an indirect wholly owned subsidiary of HSBC Holdings N.A. HSBC US is HSBC Holdings' principal US banking subsidiary, with 230 branches in the United States, including 145 branches in the State of New York. HSBC US is an international dealer in FX products and

derivative instruments denominated in U.S. Dollar and other currencies. In its submission of a Resolution Plan in July 2014, HSBC identified HSBC Holdings N.A., HBSC US, and HSBC Securities (USA) Inc. as material entities to HSBC's US operations, and identified HSBC as a non-U.S. material entity because of its connections with HSBC's US operations.

32.   Plaintiff refers herein to Defendants HSBC Holdings, HSBC, HSBC Holdings N.A., and HSBC US collectively as "HSBC."

33.   Defendant J.P. Morgan Chase & Co. ("J.P. Morgan Chase") is a Delaware corporation headquartered at 270 Park Ave., New York, New York.

34.   Defendant J.P. Morgan Chase Bank, N.A. ("J.P. Morgan") is a federally-chartered national banking association headquartered at 270 Park Avenue, New York, New York, and is a wholly owned subsidiary of Defendant J.P. Morgan Chase. J.P. Morgan Chase disclosed in its Resolution Plan filed in 2014 that it enters into FX derivatives, including over-the-counter ("OTC") and exchange-traded derivative contracts, as well as FX forward contracts, to mitigate or modify its FX and other exposure risks. J.P. Morgan Chase also disclosed that it seeks to earn a spread between its client derivatives and offsetting positions, and from the remaining open risk positions. In its 2013 Annual Report, J.P. Morgan Chase disclosed that its Treasury and Chief Investment Office are predominantly responsible for monitoring and managing its FX risks. J.P. Morgan Chase's Corporate & Investment Bank division is responsible for markets and client services for FX market making and other derivatives activities. J.P. Morgan Chase further disclosed that it had a notional amount of FX spot, futures and forwards derivative contracts in the amount of $3.773 billion at December 31, 2013.

35.   Plaintiff refers herein to Defendants J.P. Morgan Chase and J.P. Morgan collectively as "J.P. Morgan."

36.     Defendant The Royal Bank of Scotland Group plc ("RBS Group") is a United Kingdom public limited company. RBS Group is registered in the U.S. as a bank holding company and a financial holding company, and it is subject to regulation and supervision by the Federal Reserve. In its 2013 Annual Report, RBS Group disclosed that it is subject to certain risks, including "counterparty exposures" arising from foreign exchange and other transactions. It further disclosed that its FX currency exposures include net assets, net investment hedges and economic hedges related to U.S. Dollar, Euro and other non-sterling currencies.

37.     Defendant The Royal Bank of Scotland plc ("RBS") is a United Kingdom public limited company headquartered at Edinburgh, United Kingdom, and also has a registered office at 340 Madison Avenue, New York, New York. RBS is a subsidiary of RBS Group. As discussed in more detail below, according to a settlement with the Commodity Futures Trading Commission ("CFTC") over its FX manipulation, RBS is a British and financial services company headquartered in the United Kingdom, and with operations in over 40 countries and territories, including in the U.S. RBS has been provisionally registered as a swaps dealer since December 31, 2012.

38.     According to a Resolution Plan filed by RBS Group, RBS's New York branch is supervised by the New York State Department of Financial Services, and its Stamford, Connecticut branch is supervised by the Connecticut Department of Banking. RBS Group designated RBS's New York and Connecticut branches as material entities, and both branches are subject to supervision by the Federal Reserve. RBS also is a member of ICE Clear Credit and the CME. In its Resolution Plan, RBS Group disclosed that 24 percent of its consolidated income in 2013 was generated from operations in the U.S. In its Annual Report, RBS Group disclosed total income in the amount of £19,757 million.

39.     RBS Group's affiliate, RBS Americas Property Corp ("RBS Property"), is a Delaware corporation that provides property services to RBS Group's U.S.-based affiliates. One of RBS Property's principal assets is the Stamford, Connecticut headquarters of RBS, which comprises its North American headquarters. RBS also has offices throughout the United States, including in New York.

40.     In the United States, RBS provides fixed income and FX services to clients through an investment banking division known as "Markets and International Banking Americas." According to RBS Group's Resolution Plan, hedging derivatives are booked to RBS's Connecticut branch. According to RBS's Annual Report for 2013, 24 percent of RBS's and its subsidiaries global revenue is attributable to the US operations.

41.     Defendant RBS Securities, Inc. ("RBS Securities") is a Delaware corporation with its headquarters located at 600 Washington Boulevard, Stamford, Connecticut. RBS Securities is RBS Group's primary U.S. broker-dealer and is subject to regulation by the Securities Exchange Commission and FINRA, and is registered as a Futures Commission Merchant with the CFTC. RBS Securities conducted a global FX trading business through its Global Banking and Markets Strategy Group, with numerous traders based in Stamford, Connecticut. RBS Securities' FINRA registration specifies that it "engages in swaps and foreign exchange brokerage." RBS and RBS Securities both are members of the CME.

42.     Plaintiff refers herein to Defendants RBS, RBS Group, and RBS Securities collectively as "RBS."

43.     Defendant UBS AG ("UBS") is a Swiss global financial institution with its headquarters and its principal place of business in Zurich, Switzerland, and in Basel, Switzerland, respectively. UBS has offices in more than 50 countries, including branches and

representative offices in New York, Connecticut, Florida, Illinois and California. UBS has its U.S. headquarters at 1285 Avenue of the Americas, New York, New York. UBS maintains trading hubs in both New York, New York, and Stamford, Connecticut.

44.     UBS is subject to oversight regulation by the Federal Reserve and is designated as a financial holding company under U.S. law, which allows UBS to engage in a broad spectrum of activities in the U.S. All of UBS's branches in the U.S. are licensed by the Office Comptroller of the Currency or state banking authorities. In its Resolution Plan filed in July 2014, UBS reported that it had consolidated assets of approximately CHF 1,010 billion, with the great majority in Switzerland, the United Kingdom and the U.S. UBS has its Global Registered Shares listed on the NYSE, Zurich and Tokyo Stock Exchanges.

45.     In the U.S., UBS operates three business divisions, including the Investment Bank division, which houses UBS's sales, trading and market making across a range of products, including FX spot, forwards, swaps and options. In its Resolution Plan, UBS reported that it "engaged in extensive high volume market-making and client facilitation trading referred to as the flow business." As discussed in more detail below, according to the CFTC's Order and Settlement with UBS regarding its FX manipulation, the Investment Banking division of UBS is responsible for its FX business and that traders' attempts to manipulate certain FX "benchmark rates involved multiple currencies, including the [U.S. Dollar], Euro and British Pound Sterling." The CFTC further confirmed in its Settlement Order that UBS's FX manipulation involved traders on trading desks and offices located in at least Stamford, Connecticut and Zurich, Switzerland. In addition to traders in the Stamford, Connecticut office, UBS has suspended traders on its New York foreign exchange trading desk.

46.     Defendant UBS Securities LLC ("UBS Securities") is a Delaware limited liability company with its main office located at 1285 Avenue of the Americas, New York, New York. USB Securities leases space from its UBS affiliates and shares space with UBS in its offices located in Stamford, Connecticut. UBS Securities is an indirect wholly-owned subsidiary of UBS, and UBS has designated UBS Securities as a material entity in its Resolution Plan filed with the Fed. UBS Securities is regulated by the SEC and FINRA and also is a Futures Commission Merchant licensed and regulated by the CFTC. UBS Securities, in regulatory filings required by the CFTC, discloses that it provides a full range of investment banking services, including trading and sales.

47.     In its firm profile registered with FINRA, UBS Securities discloses that UBS owns between 25 and 50 percent of UBS Securities and directs the management or policies of the firm. It also discloses that several individual Managing Directors each own less than 5 percent of UBS Securities, including Managing Directors that are FX traders and risk managers. UBS Securities shares employees, including FX traders, with UBS. In UBS Securities' Futures Commission Merchant Disclosure Document, it discloses that some of the responsibilities of its Managing Directors and FX traders "include coordination and monitoring between the different product teams, and review of significant business initiatives with regard to financial, reputational and transactional risk." These Futures Commission Merchant disclosures further disclose that UBS Securities' FX Prime Brokerage and Clearing services includes futures.

48.     Plaintiff refers herein to Defendants UBS and UBS Securities collectively as "UBS."

49.     "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by

the named Defendants and each named Defendant's wholly owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

50.     During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the conspiracy by trading FX Futures and other FX related instruments at manipulated prices not reflecting fundamental supply and demand, to the direct benefit of Defendants.

51.     Whenever reference is made to any act of any entity, the allegation means that the entity engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

52.     Each of the Defendants named herein acted as the agent of or participated in a joint venture for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

**I.      Overview Regarding FX Futures Contracts**

53.     In an FX futures contract, an investor agrees to buy or sell a foreign currency at a set price and date in the future. FX futures contracts are traded on exchanges, such as the CME's Globex electronic trading platform, and are regulated by the CFTC.

54.     FX futures contracts generally require delivery of a specified quantity of a specified currency,[3] or a cash settlement, during the months of March, June, September, and December (known as the March Quarterly Cycle). The quarterly settlement date is the third

---

[3] For example, the trade units for the three most actively traded CME FX futures contracts are: for the EUR/USD — 125,000 EUR; for the JPY/USD — 12,500,000 JPY; and for the GBP/USD — 62,500 GBP.

Wednesday in March, June, September and December, with trading ending on the second business day before the third Wednesday of the contract month (the "Settlement Date").

55.    FX futures are based upon the exchange rates of the two currencies at issue in the contract. Major cross-rate FX futures contracts include contracts on Euros vs. U.S. Dollars (EUR/USD); Japanese Yen vs. U.S. Dollars (JPY/USD); British Pounds vs. U.S. Dollars (GBP/USD); Swiss Francs vs. U.S. Dollars (CHF/USD); Canadian Dollars vs. U.S. Dollars (CDN/USD); and Australian Dollars vs. U.S. Dollars (AUD/USD), among others.

56.    FX futures contracts are agreements created and marketed by the exchanges on which they trade.

57.     FX futures contracts have highly standardized terms directed to, *inter alia*, the specific currencies pairs at issue, the quantity of currency to be exchanged, the delivery time and the delivery place. The single open variable on exchange-traded FX Futures contracts is price, which, absent collusion and manipulation, is determined by competition at the date and time the contract is entered into.

58.    Exchange-traded FX futures contracts have two "sides" — the "long" side and the "short" side. A trader who "goes long" is committed to take or accept delivery of the specified currency at the specified price on the third Wednesday of a March, June, September, or December in the future. Conversely, a trader that "goes short" agrees to sell the specified currency at the specified price on the third Wednesday of a March, June, September, or December in the future.

59.    In addition to FX futures contracts, exchanges also offer FX options on futures, which settle based on FX futures contract prices. Exchange traded FX options are similar to exchange traded futures with respect to their high degree of standardization, such that price is

the only competitive variable, with the price being determined, absent Defendants' collusion and manipulation, by competition.

60.    The price at which an option is bought or sold is the option premium. The option premium is directly affected by the underlying price of the FX futures contract, and of the FX spot prices for the underlying currency.

61.    Plaintiff bought and sold exchange traded FX futures contracts, as well as options on FX futures.

62.    There are two primary methods of settling FX futures contracts. For each method, the settlement value of the contract is calculated by comparing the price when the contract was entered to the price when the contract is closed. By far the most common method is for buyers and sellers to close their positions prior to the final Settlement Date on the contract. Traders do this by offsetting their original positions by taking an opposite position. Thus, a trader long 150 September 2015 EUR/USD contracts could close the position by going short 150 September 2015 EUR/USD contracts. When an opposite position closes the trade prior to the Settlement Date, a profit or loss is credited to or debited from the trader's account. The difference between the initial purchase or sales contract price and the contract price of the offsetting transaction represents the realized profit or loss per each contract.

63.    Only a small percentage of FX Futures contracts are held until the Settlement Date. Setting the settlement price of an FX Futures contract is not dependent on whether it is cash settled or physical delivery occurs.

64.    The CME is the largest regulated FX marketplace in the world, offering at least 73 currency futures and 31 contracts with over $100 billion in daily liquidity.

65.     According to the CME, the calculation of the daily settlement price ("Daily Settlement Price") for FX futures contracts is based on trading activity on the CME Globex. The calculation of the CME Daily Settlement Price is based on the volume weighted average prices of underlying futures contracts traded on CME Globex during the 30 second window ending at 2:00 p.m. Central Time ("CT") (the "CME Daily Settlement Fix").[4]

66.     The CME Daily Settlement Price is a critical benchmark as it provides the basis for, *inter alia*, the pricing of American-style FX options. This price has particular importance on option expiration dates (usually Fridays), when the CME uses it to force the exercise of in-the-money options for Great Britain Pounds, Canadian Dollars, Euros, Japanese Yen, Swiss Francs and Australian Dollars, and to impose automatic forced abandonment of all out-of-the-money options. According to the CME, the use of the CME Daily Settlement Fix, particularly in connection with weekly expiring options, enables CME Clearing, clearing firms and their customers to predict shortly after 2:00 p.m. CT on Fridays which expiring FX options positions will be assigned futures positions.

67.     For FX Futures held until the Settlement Date, the final settlement price is determined by the CME based on trading prices in the relevant contract during the 30 second period between 9:15:30 a.m. and 9:16:00 a.m. CT on the Settlement Date.

68.     The ICE is home to 60 currency futures contracts, as well as the actively-traded U.S. Dollar Index ("USDX") futures and options contracts. ICE also allows Trade at Settlement ("TAS") for certain FX Futures contracts traded on the ICE electronic trading platform. TAS allows a trader to enter an order to buy or sell a futures contract during the trading day at a price equal to the Exchange's daily settlement price for that contract, or at a price up to five ticks

---

[4] *See* http://www.cmegroup.com/trading/fx/currfixprice.html.

above or below the settlement price. The daily settlement window for USDX futures and options and currency pair futures on ICE is 2:59 to 3:00 p.m. (Eastern time), which is 2:00 p.m. CT.

69.     As described below, the prices of FX Futures are directly tied to FX spot prices and FX benchmarks.

## II.     Overview of the FX Spot Market

70.     The FX spot market is the world's largest and most liquid financial market. In the FX spot market, participants actively buy, sell, exchange and speculate on currencies. The spot contract is used for immediate exchange of funds. Pricing of FX spot rates is determined by supply and demand of the currency in the market.

71.     As with FX Futures, in the spot market, currencies are traded in pairs, consisting of a base or fixed currency and a variable currency. In April 2013, the U.S. Dollar was on one side of 87% of all FX transactions globally, and traded in 89% of all FX transactions in the U.S.

72.     Parties interested in trading in the FX market typically contact broker banks, such as the Defendants, to obtain a bid/ask spread, which is supposed to reflect true market conditions at that time. The bid price reflects the price at which the bank is willing to buy the relevant currency and the ask price reflects the price at which the bank is willing to sell the currency. The difference, or spread, between the bid and the ask prices reflects the compensation the broker bank receives for executing the transaction. During the Class Period, the overwhelming majority of all FX spot trading occurred in bi-lateral over-the-counter ("OTC") transactions.

73.     Entities can also contract to trade certain currencies at FX benchmark rates. To place a benchmark spot order, a customer gives the dealer instructions to buy or sell an agreed

upon quantity of currency at a fixing rate. The most important FX benchmark rates are those set by WM/Reuters.

74.     WM/Reuters publishes a series of rates for various currency pairs at set times in the day, including on the hour. The WM/Reuters Rates, especially for G10 currencies, provide critical benchmark reference points for establishing the relative values of different currencies and are used in the US and global financial markets by market participants, including Defendants and other banks, asset managers, pension funds and corporations to value their portfolios and transact at a published benchmark rate.

75.     As a result of its widespread use and acceptance as a pricing mechanism and as the primary benchmark for currency trading globally, the WM/Reuters Closing Spot Rates generally, and the London Fix rates particularly, occupy a crucial role in the operation of financial markets.

76.     In addition to direct communication with traders at broker banks, parties can also execute FX spot trades through electronic communications networks ("ECNs"). ECNs are proprietary computer trading platforms created and operated by broker banks that automatically match buy and sell orders at specific prices. ECN systems collect critical data about FX transactions, including the relevant counterparties, the affected currencies, the size of the transactions, the number of transactions and the actual exchange rates at which the transactions were executed. This information is proprietary to the broker banks that operate the ECN systems, and can provide important inside information to those broker banks regarding FX pricing and market trends and directions.

77.     There is no centralized exchange or institution that collects and/or posts real-time trade information, such as order flows and volume. Defendants' real-time order flow and

volume data is not available to the market, such as it would be on an exchange, where the entire market knows the volume and prices of trades as they occur.

78.    Defendants closely guard this proprietary information and do not make it commercially available, even for purchase. As horizontal competitors, absent an agreement to collude, each bank would not share this client-sensitive, proprietary information with one another. However, as found by global regulators, and as reflected in recent regulatory settlements described herein, Defendants did share this confidential information with one another in furtherance of their conspiracy to manipulate FX spot prices and benchmark rates.

**III.    Defendants' Domination of the FX Spot Market**

79.    Notwithstanding its liquidity, the FX spot market is extremely concentrated and susceptible to manipulation by market actors, such as Defendants, who have dominated the global FX spot market during the period relevant hereto.

80.    According to FX Surveys by *Euromoney*, an industry publication, Defendants' shares of the global FX spot market for 2013 and 2014 years were: Citigroup (14.90%, 16.04%); Barclays (10.24%, 10.91%); UBS (10.11%, 10.88%); HSBC (6.93%, 7.12%); J.P. Morgan (6.07%, 5.55%); Bank of America (3.08%, 4.38%); and RBS (5.62%, 3.25%). Collectively Defendants' share of the FX market for 2013 and 2014 was 56.95% and 58.13%, respectively.[5]

81.    Defendants also dominate the U.S. FX spot market. The Federal Reserve Bank of New York reported that as of April 2013, the top ten banks engaged in 98% of all spot volume in the FX market, up from 91% in April 2010. Further reflecting this high degree of concentration, the five largest banks by volume accounted for 80% of U.S. spot transactions in April 2013.

---

[5] *See* http://singledealerplatforms.org/2014/05/11/euromoney-2014-fx-poll-deutsche-toppled-from-1-spot/.

82.     Only certain banks like Defendants were established as dealers in the spot market. This designation allowed them to participate directly in FX spot trading. Other market participants, referred to as "non-dealers," such as pension funds, hedge funds, fund managers, corporate and private clients, have been required to trade through dealers. FX trading platforms are only accessible to dealers. Dealers, like Defendants, were market makers during the Class Period, and they set prices in the market based on such factors as their own market assessment, the volume of their currency positions and risk appetite.

83.     Within the limited number of major broker banks, the FX spot market is further controlled by a small and close-knit group of traders employed by Defendants—approximately 8 to 10 traders at each Defendant bank. These traders have strong ties, formed by, *inter alia*, their long history of working and socializing with one another.

## IV.    Defendants' Manipulation of FX Spot Prices and Benchmark Rates

84.     Beginning at least as early as January 1, 2008, Defendants conspired to manipulate FX spot prices and benchmark rates, including the WM/Reuters Rates, for the benefit of their own trading books. This active manipulation was principally directed in connection with the setting of the 4:00 p.m. London Fix.

85.     Although Defendants typically closely guard proprietary real-time trade information, such as order flows and volume, to carry out this manipulation, Defendants shared confidential information with one another, including via voice trading operations, chat rooms, electronic messaging, and email. Through this collusively activity, Defendants developed and executed trading strategies designed to manipulate, and which actually did manipulate, spot prices and benchmark rates for selected currencies, which had the effect of manipulating FX Futures trading prices of those currencies.

86.     As discussed above, the London Fix rates are the primary benchmark for global FX rates and have become the standard for the closing spot rates for major currency pairs.

87.     WM/Reuters provides spot fix rates for 160 currencies. For 21 major currencies, known as "Trade Currencies" (which include all of the G10 currencies), the London Fix rates are calculated using the median of a snapshot of bid and ask order rates and actual spot transactions over the 60 second fix period around 4:00 p.m. London time. The WM/Reuters Rates, including London Fix rates, are published to the market shortly after they are calculated.

88.     The WM/Reuters Rates are sourced from what are assumed to be bona fide arm's length transactional trade and order prices obtained from liquid platforms. Because WM/Reuters Rates are based on the median value of the transactions, they do not take the notional size of the quotes and transactions into account; all quotes and transactions are weighted equally. Thus, ten $100 trades executed in succession could have a significantly greater impact on prices than one $1000 trade.

89.     Defendants knew the methodology used to calculate the WM/Reuters Rates was vulnerable to manipulation in part because WM/Reuters did not use volume data in the calculation of spot prices even though the dealer banks knew that trade volumes is a "key consideration in the calculation of accurate fixings." *See* Foreign Exchange Joint Standing Committee Chief Dealers Sub Group, Draft Minutes of the 4 July 2008 Meeting at HSBC, 8 Canada Square, London E14 5HQ (available at http://bit.ly/ leMBcAq), at 71.[6]

---

[6] The Chief Dealers Sub Group consists of 11 chief traders active in the London FX market and top Bank of England officials. The Chief Dealers Sub Group meets three to four times per year. Between 2005 and 2013, representatives from Barclays (2005-2012), Merrill Lynch (Bank of America) (2006-2007), HSBC (2007-2013), J.P. Morgan (2007-2009, 2011-2013), Morgan Stanley (2005-2008, 2010-2011), Goldman Sachs (2009-2013), BNP Paribas (2009-2013), Deutsche Bank (2005-2012), RBS (2005-2013), UBS (2005-2013), Credit Suisse (2005-2008), and Citigroup (2005-2013), participated in the Chief Dealers Sub Group. Foreign Exchange Joint Standing Committee Chief Dealers' Sub Group Meeting Minutes, 2005-2013 (available at http://bit.ly/leMBcAq and http://bit.ly/lkDSdSj).

90.    Defendants exploited the vulnerability in the methodology for calculating the WM/Reuters Rates, and actively colluded to manipulate FX spot prices and the WM/Reuters Rates.

91.    Throughout the Class Period, Defendants' FX traders used, *inter alia*, electronic communications, including chat rooms named "The Cartel," "The Bandits' Club," "The Mafia," "the players," "the 3 musketeers," "a co-operative," the "A Team" and "One Team, One Dream," to collude and actively exchange confidential client and bank trading information to manipulate FX prices. Entry into these chat rooms—often by invitation only—was highly coveted among traders because of the critical information revealed among its members.

92.    Through those electronic chat rooms, confidential and propriety information was exchanged, both internally within the banks, as well as with third parties at other banks.

93.    In one example cited in the CFTC's settlement with Citibank, traders discussed whether admission of a new trader into the group would "add huge value to this cartel." Existing chat room members agreed to grant the new trader a one month trial-period, with a warning to the new member: "mess this up and sleep with one eye open at night."

94.    Defendants' top-level traders ran the chat rooms: Richard Usher ran The Cartel while he was J.P. Morgan's chief currency dealer in London and head of spot trading for G10 currencies from 2010-2013. Other members included: Rohan Ramchandani, Citibank's head of spot trading in London; Matt Gardiner, Barclays' director of spot trading for EUR/USD from 2007 to 2011; Chris Ashton, former head of Barclays voice spot trading globally; and Niall O'Riordan, UBS's co-global head of G10 and emerging market spot trading.

95.    As evidenced by the limited excerpts of transcripts of trader chat rooms made publicly available through recent government settlements, these chat rooms involved overt

communications and agreements to manipulate FX spot currency and benchmark rates in a way that was intended to benefit the conspirators, to the disadvantage of clients and the market.

96.    As detailed below, according to the regulatory settlements to date, Defendants routinely aggregated their client orders to determine what their individual net positions in specific currencies were going to be at, for example, the London Fix. It was Defendants' common practice to then share this critical information with one another to determine aggregate net positions in those currencies at the fix.

97.    Prior to the announcement of the regulatory settlements, Defendants produced evidence to government investigators confirming that their traders "inappropriately share[d] market-sensitive information with rivals." This evidence confirmed that "[s]hortly before the fix . . . it was common for a group of senior currency traders to discuss with their competitors the types and volume of trades they planned to place." A transcript provided by RBS to the  United Kingdom's Financial Conduct Authority ("FCA") revealed, for example, that J.P. Morgan's Richard Usher wrote "messages to traders at other firms [that] included details of his trading positions." Defendants' traders confirmed that "chatroom discussions between rival traders . . . allowed them to share information about pricing and order books."

98.    Certain of the Defendants have admitted that they shared their confidential customer information with each other. By sharing their client trading positions, Defendants gained an understanding of the overall order flows across the FX spot market for relevant currencies, allowing them to determine, in advance, which way they could move market prices. According to traders, banks "would share details of orders with brokers and counterparts at banks through instant messages to align their strategies" and "improve their chances of getting the desired move in the benchmark."

24

### V.     Defendants' Mechanisms of Manipulation

99.     Defendants colluded to use several mechanisms to manipulate benchmark rates such as the London Fix. These tactics included "front running/trading ahead," "banging the close," and "painting the screen."

100.    Traders "front run" on customer information when they receive customer orders that could move the market and then trade their own proprietary positions prior to executing their customers' market-moving trades. Large client orders come from, for example, tracker funds, which typically place orders as much as an hour before key benchmark rates — primarily the London Fix rates — are set. Such an order gives traders information about the direction the market will likely move, and traders from the largest dealer banks have admitted that they use the information to take positions that benefit the bank — to the detriment of the customer.

101.    Even one large transaction can move the market.

102.    Absent collusion, a bank "front running" the market would still face risk that another bank with a larger position could trade in the same currency, but in the opposite direction at the same time. To avoid this risk, Defendants agreed to "front run" together.

103.    Defendants also engaged in "banging the close" to manipulate FX spot prices and benchmark rates. "Banging the close" occurs when traders break up large customer orders into small trades and concentrate the trades before and during the 60-second fixing window in order to intentionally spike the published rates up or down. Because WM/Reuters Rates, such as the London Fix, are based on the median of trades during the calculation window and not weighted for the average notional amount of a transaction, the rates are susceptible to manipulation by banging the close. That is, 100 trades of $1 can impact the WM/Reuters Closing Spot Rates to a greater degree than a single trade of $100.

104.   Defendants also manipulated FX spot prices and FX benchmark rates by "painting the screen." Painting the screen occurs when Defendants place phony orders with one another to create the illusion of trading activity in a given direction in order to move rates prior to the fixing window. After the London Fix rates were calculated, Defendants then reversed those trades.

105.   Thus, by agreeing in chat rooms and instant messages to, among other practices, "front run" the execution of customer orders, "bang the close," and "paint the screen," Defendants manipulated FX currency spot prices and benchmark rates, which, as discussed below, had the immediate, direct, substantially certain and foreseeable effect of also manipulating prices of FX Futures.

106.   Some of the Defendants have suspended their officers or traders who participated in the manipulation of FX spot prices, or who knew about or condoned such manipulation.  For example, in March 2014, the Bank of England suspended its chief currency dealer Martin Mallet. Similarly, J.P. Morgan's Richard Usher was placed on leave in October 2013, and left the bank in November 2014, Citibank's Rohan Ramchandani was placed on leave in October 2013 and then terminated in January 2014, Robert de Groot, global head of spot trading for BNP Paribas, was suspended in March 2014, and UBS's Niall O'Riordan was suspended in October 2013.

107.   As of October 6, 2014, a Wall Street Journal article reported that banks had fired or suspended about 30 employees "linked to the currency investigation." The WSJ further reported that banks that had agreed to settle with the FCA "were not necessarily the most culpable, but rather the ones most willing to reach a settlement."

## VI.   Regulatory Investigations and Enforcements

108.   Governmental and regulatory authorities in the United States, United Kingdom, European Union, Switzerland, Germany, Asia, Australia, New Zealand, and the international

Financial Stability Board ("FSB") launched investigations into Defendants' manipulation of the FX market.

109.   As a result of these investigations into certain of the Defendants' practices, global regulators have found that the Defendants actively colluded with other broker banks to manipulate FX spot prices and FX benchmark rates.

110.   The Defendants subject to these regulatory actions have pled guilty and/or paid collectively billions of dollars in fines and penalties. In particular, and as discussed in more detail below, the following regulatory settlements of ongoing FX market manipulation investigations have been announced:

> a.   On May 21, 2015, the United States Department of Justice announced a resolution of its FX manipulation probe into the practices of Citigroup, J.P. Morgan, Barclays, UBS, and RBS. Pursuant to their agreement with the DOJ, Citigroup, J.P. Morgan, Barclays, and RBS pled guilty to conspiring to manipulate the FX spot market.  UBS pled guilty to breaching a non-prosecution agreement related to LIBOR rates which was based in part on its conduct in manipulating the FX market.  In total these defendants agreed to pay more than $2.5 billion in criminal fines.  *See* Department of Justice, Office of Public Affairs Press Release, "Five Major Banks Agree to Parent-Level Guilty Pleas" (May 20, 2015).[7]

> b.   On May 20, 2015, the CFTC announced an Order accepting an offer of settlement from Barclays in connection with its investigation of manipulation of, *inter alia*, the FX benchmark rates.  The CFTC imposed civil penalties totaling

---

[7] *See*  http://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.

$400 million on Barclays. *See* CFTC Press Release, "Barclays to Pay $400 Million Penalty to Settle CFTC Charges of Attempted Manipulation and False Reporting of Foreign Exchange Benchmark Rates."[8]

c.      On November 12, 2014, the CFTC announced five Orders filing and settling charges against Defendants Citibank, HSBC, J.P. Morgan, RBS and UBS in connection with its investigation of manipulation of, *inter alia*, FX benchmark rates. The CFTC imposed fines totaling $1.4 billion on these banks.  *See* CFTC Press Release, "CFTC Orders Five Banks to Pay Overview $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates" (Nov. 12, 2014).[9]

d.      On November 11, 2014, the UK FCA announced settlements with these same five banks, imposing a total fine of $1.7 billion for, *inter alia*, their failure to control their FX trading operations. *See* FCA Press Release, "FCA Fines Five Banks £1.1 Billion for FX Failings and Announces Industry-wide Remediation Programme" (Nov. 11, 2014).[10]

e.      In Consent Orders for a Civil Money Penalty, also announced on November 11, 2014, the U.S. Office of the Comptroller of the Currency ("OCC") fined BofA, J.P. Morgan and Citibank an additional $950 million total for, *inter alia*, permitting an environment in which "unscrupulous traders discussed manipulating foreign exchange markets." *See* OCC Press Release, "OCC Fines Three Banks $950 Million for FX Trading Improprieties (Nov. 12, 2014).[11]

---

[8] *See* http://www.cftc.gov/PressRoom/PressReleases/pr7181-15.
[9] *See* http://www.cftc.gov/PressRoom/PressReleases/pr7056-14.
[10] *See* http://www.fca.org.uk/news/fca-fines-five-banks-for-fx-failings.
[11] *See* http://www.occ.gov/news-issuances/news-releases/2014/nr-occ-2014-157.html.

f.    On November 12, 2014, the Swiss Financial Market Supervisory Authority ("FINMA") concluded its enforcement action against UBS, finding, *inter alia*, that UBS severely violated the proper business conduct requirements for FX trading and imposing a CHF 134 million ($139 million) fine. FINMA also investigated three Swiss banks in addition to UBS regarding misconduct in FX trading, and imposed corrective supervisory measures to remedy the shortcomings that emerged in the investigation. *See* FINMA Press Release, "FINMA Sanctions Foreign Exchange Manipulation at UBS (Nov. 12, 2014).[12]

### A.    DOJ Guilty Pleas and Fines

111.   On May 21, 2015, the DOJ announced Citigroup, J.P. Morgan, Barclays, RBS, and UBS agreed to plead guilty related to their market manipulation activities.

112.   In particular, Citigroup, J.P. Morgan, Barclays, RBS pled guilty to a one-count felony charge of conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere. "According to plea agreements . . ., between December 2007 and January 2013, euro-dollar traders at Citicorp, JPMorgan, Barclays and RBS – self-described members of "The Cartel" – used an exclusive electronic chat room and coded language to manipulate benchmark exchange rates. Those rates are set through, among other ways, two major daily "fixes," the 1:15 p.m. European Central Bank fix and the 4:00 p.m. World Markets/Reuters fix. "The Cartel" traders coordinated their trading of U.S. dollars and euros to manipulate the benchmark rates set at the 1:15 p.m. and 4:00 p.m. fixes in an effort to increase their profits."[13]

---

[12] *See* http://www.finma.ch/e/aktuell/pages/mm-ubs-devisenhandel-20141112.aspx.
[13] *See* DOJ Press Release available at http://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.

113.   "These traders also used their exclusive electronic chats to manipulate the euro-dollar exchange rate in other ways. Members of "The Cartel" manipulated the euro-dollar exchange rate by agreeing to withhold bids or offers for euros or dollars to avoid moving the exchange rate in a direction adverse to open positions held by co-conspirators.  By agreeing not to buy or sell at certain times, the traders protected each other's trading positions by withholding supply of or demand for currency and suppressing competition in the FX market."

114.   "Citicorp, which was involved from as early as December 2007 until at least January 2013, has agreed to pay a fine of $925 million."

115.   "Barclays, which was involved from as early as December 2007 until July 2011, and then from December 2011 until August 2012, has agreed to pay a fine of $650 million."

116.   "JPMorgan, which was involved from at least as early as July 2010 until January 2013, has agreed to pay a fine of $550 million."

117.   "RBS, which was involved from at least as early as December 2007 until at least April 2010, has agreed to pay a fine of $395 million."

118.   Separately, in 2012-2013, the DOJ entered into individual deferred prosecution and non-prosecution agreements with Defendants Barclays, UBS, and RBS in connection with LIBOR investigations. These non-prosecution and deferred prosecution agreements require each bank to provide information relating to benchmark manipulation, including manipulation of FX benchmark rates. UBS and other banks, including J.P. Morgan and Citibank, have disclosed that they are under criminal investigation for FX manipulation.

119.   The DOJ "determined that UBS's deceptive currency trading and sales practices in conducting certain FX market transactions, as well as its collusive conduct in certain FX

markets, violated its December 2012 non-prosecution agreement resolving the LIBOR investigation." The DOJ "declared UBS in breach of the agreement."

120.   "UBS has agreed to plead guilty to a one-count felony charge of wire fraud in connection with a scheme to manipulate LIBOR and other benchmark interest rates."

121.   UBS has also agreed to pay a criminal penalty of $203 million.

### B.   *CFTC Settlements with Citibank, HSBC, J.P. Morgan, RBS, UBS & Barclays*

122.   On November 11, 2014, the CFTC entered into five separate Orders Instituting Proceedings against Defendants Citibank, HSBC, J.P. Morgan, RBS and UBS, finding that each violated Sections 6(c), 6(d) and 9(a)(2) of the CEA, as well as Regulation 180.2, 17 C.F.R. 180.2, for conduct occurring on or after August 15, 2011. The CFTC Orders stated that it has reason to believe that Citibank, RBS and UBS each violated the CEA from 2009 through 2012, that HSBC did so from 2009 through mid-2012, and that J.P. Morgan did so from 2010 through 2012.[14] On May 20, 2015, the CFTC entered into an Order Instituting Proceedings against Barclays, finding that Barclays violated Sections 6(c), 6(d) and 9(a)(2) of the CEA, as well as Regulation 180.2, 17 C.F.R. 180.2, for conduct occurring on or after August 15, 2011.

123.   Among other things, the CFTC found that these banks attempted to manipulate and aided and abetted other banks in their attempts to manipulate the WM/Reuters Rates and other benchmark rates, by and through certain of their FX traders, who sought to benefit their banks' own trading positions, or the positions of traders at other banks.

124.   Along with its orders, on November 12, 2014, the CFTC published transcripts of examples of misconduct and private chat room "conversations" between and among traders at Citibank, HSBC, J.P. Morgan, RBS and UBS. The CFTC disclosed sufficient information to

---

[14] CFTC Orders are available at http://www.cftc.gov/PressRoom/PressReleases/pr7056-14.

identify each of these banks in excerpts of transcripts of group chats, and described in various settlement agreements HSBC as "Bank U", RBS as "Bank V", Citibank as "Bank X", J.P. Morgan as "Bank Y" and UBS as "Bank Z".

125.   The CFTC related the five banks' unlawful conduct to, *inter alia*, an increase in market participants' desire to trade currencies following the global financial crisis in late 2007. The resulting increase in liquidity and volume in the FX market provided an opportunity for FX traders at these banks to take advantage of trading opportunities, specifically around the setting of FX benchmark rates. To do this, the FX spot traders used and developed relationships with traders at other banks to communicate and share information in order to coordinate attempts to manipulate certain FX benchmark rates, including the London Fix.

126.   In its Orders for each of the banks, the CFTC found: "Certain FX traders at [each of the named banks] regularly participated in numerous private chat rooms. At times, in certain chat rooms, FX traders at [each bank] and other banks disclosed confidential customer order information and trading positions, altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates, in some cases downward and in some cases upward."

127.   The CFTC's Orders for each bank also provide details regarding private chat rooms where the banks' FX traders communicated information regarding the size and direction of net orders with FX traders at other banks and obtained and used this information to manipulate FX benchmark rates prior to or during relevant fixing periods.

128.   The CFTC found that each bank was liable for the acts, omissions and failures of its traders engaging in the unlawful FX manipulation, including each bank's G10 FX spot traders' attempts to manipulate FX benchmark rates. Each bank's FX traders conspired with

other banks' FX traders and used private chat rooms to communicate and plan their efforts to manipulate the FX benchmark rates, involving multiple currencies.

1.    *CFTC's Order Related to Citibank*

129.    In the CFTC's Citibank Order, it highlighted the conspirators' concerns to protect cartel members and ensure new members invited to join the chat room "agreed to put the interests of the group first." Some of the quoted conversations in the Order against Citibank shows Citibank, J.P. Morgan and UBS traders' combined efforts to ensure that a proposed new member of the chat room group, "agreed to put the interests of the group first."

130.    A Citibank trader chatted with a UBS trader J.P. Morgan trader and referred to market participants outside the chat room group as the "other numpty's" in the market, and questioned whether a new member "protect us...like we protect each other."

131.    The CFTC found that Citibank's FX traders' misconduct occurred over the course of 2009 through 2012, without detection by Citibank because of inadequate internal controls over the use of chat rooms, as well as supervisory failures. Specifically, the CFTC found that Citibank "failed to adequately assess the risks associated with its participation in the fixing of certain FX benchmark rates, including the 4 p.m. WM/R benchmark rates."

132.    The CFTC Order also details a Citibank FX traders' attempt to coordinate with a trader at J.P. Morgan to "manipulate the EUR/USD fix just ahead of the 4 p.m. fix." Plaintiff provides more detail about this conversation in their discussion below regarding the CFTC's Order related to J.P. Morgan.

133.    The CFTC's Order also showed how a Citibank FX trader ("Bank X Trader" below) coordinated with traders from other banks to "match off" in the EUR/USD fix, and to coordinate to manipulate the USD/CHF fix. The CFTC noted that the fix discussions began at

3:16 p.m. (in advance of the London Fix) on the particular day, with traders sharing position information for several currencies, including EUR, AUD, JPY and CHF. According to the CFTC, between 3:31 and 3:40, the chat room participants matched off their AUD positions so that they were "all good," and then turned their attention to other currency pairs:

| | | |
|---|---|---|
| Bank X Trader: | 3:53:35 | can anyone help in chf fix |
| | 3:53:38 | i lose 130 total |
| Bank Y Trader: | 3:53:46 | arb it for more ammo |
| Bank X Trader: | 3:53:55 | [Bank Z trader] ur guy want it? |
| Bank Z Trader: | 3:54:09 | nope he's flatish i think |
| Bank W Trader: | 3:54:16 | buy the eurchf and les hammer eur |
| | 3:54:18 | come on |
| Bank Y Trader: | 3:54:29 | [Bank X trader] ill do it of u want |
| | 3:54:33 | ive nothing else to do... |
| Bank X Trader: | 3:54:53 | ok 130 usdchf mine |
| Bank Y Trader: | 3:54:57 | ok 130 u buy |

Having offset their CHF positions, the traders turned their attention to the EUR in the remaining minutes before the fix:

| | | |
|---|---|---|
| Bank Y Trader: | 3:55:01 | u want small eurusd? |
| Bank W Trader | 3:55:19 | so [Bank Z trader] u get eur now? |
| Bank Z Trader | 3:56:00 | checkin |
| Bank Y Trader | 3:56:04 | right who wants 40 eur |
| Bank Z Trader | 3:56:06 | sub 30 |
| Bank Y Trader | 3:57:53 | gd lk fellas |

134.   The CFTC's Order also noted that in early 2013, "Citibank banned multi-bank chat rooms for its FX personnel."

135.   Due to Citibank's misconduct, the CFTC imposed a penalty of $310 million on Citibank and required it to implement numerous remedial steps to stop the manipulative conduct at the bank going forward.

### 2.    CFTC's Order Related to HSBC

136.   In its Order, the CFTC relayed that two of HSBC's traders on its G10 FX trading desk were primary participants in manipulating FX benchmarks. The CFTC further found that

HSBC did not detect its FX traders' misconduct because of ineffective internal controls over the use of electronic chat rooms, as well as supervisory failures.

137.   The CFTC's findings include excerpts from chat room discussions by HSBC's G10 FX traders, in which they participated with traders at other banks to manipulate FX spot prices and benchmark rates. HSBC's traders often "had multiple chat rooms open simultaneously on their trading terminals," with particular currency pairs being the focus of certain chat rooms.

138.   The CFTC Order shows a series of chats among HSBC's FX traders and three traders at other banks during which HSBC's traders revealed that they were net sellers of GBP/USD currency pairs, referred to as "cable". After HSBC's trader discloses in one chat room at 2:50 p.m. that he is a net seller (lhs)[15] in cable for the upcoming fix at 4 p.m. the same day, other members of the chat room disclosed each of their similar net seller positions, and the HSBC trader ("Bank U Trader" below) stated that the team could "whack" the fix by getting a few more trades the "same way". The CFTC provides specific details and time stamps of the chats, including as follows:

> "As the 4 p.m. fix period closed, the participants in the chartroom made the following statements:  "well done gents" . . . "hooray nice team work" . . . [and] "nice one mate."

139.   As another example, in two other chat rooms an HSBC trader communicated with other banks' traders prior to the close of the fix period, disclosing that he "has a net sell order of approximately 400 million cable at the fix." In one chat room, between 3:25 p.m. and 3:36 p.m. London time, the HSBC trader alerted other chat room participants to the size of his 400 million net sell order, encouraged other banks' traders to "get lumpy cable at the fix ok," and then stated "lets go." When the other traders communicated their own net positions, one of the traders then

---

[15]If an FX trader has orders to sell off the first currency listed in any currency pair, it is often referred to as being on the left-hand side, or "lhs." If an FX trader references right hand side, or "rhs," it indicates that the FX trader is a buyer of the first currency listed in a currency pair.

responded "yeah baby." In the second chat room, between 3:28 p.m. and 3:43 p.m., the HSBC

trader collaborated with a trader at another bank regarding sales at the fix.

140.   Within minutes of setting the 4 p.m. London Fix, the HSBC FX trader

congratulated the other chat room traders for their successful manipulation, commenting at 4:03

p.m. in a rapid series of chats: "nice job mate," "haha," "i sold a lot up there," "oversold by 100"

and "hahaha". The other traders responded: "sweet nice job," and "bravo."

141.   On the same day in a separate private chat room, an HSBC trader engaged in a

chat with another trader at another bank prior to the close of the London fix period, beginning at

3:28 p.m. and disclosed that he was selling at the fix, as follows:

| | | |
|---|---|---|
| HSBC Trader: | 3:28:45 pm: | lhs in about 300 quid cable for the fix |
| Bank V Trader: | 3:28:54 pm: | sweet |
| HSBC Trader | 3:29:42 pm: | can you do some digging and see if anyone is that way |
| Bank V Trader: | 3:29:52 pm: | of course mate |
| Bank V Trader | 3:34:49 pm: | im getting 83 at mom mate |
| HSBC Trader | 3:34:56 pm: | nice |
| Bank V Trader | 3:37:38 pm: | someone tells a guy here he is getting 170 cable at fix |
| Bank V Trader: | 3:43:28 pm: | see that [Bank U Trader] |
| HSBC Trader: | 3:43:57 pm: | thx |

142.   As the 4 p.m. London fix period ended, the traders congratulated each other on

successful manipulation of the price at the fix. The CFTC quoted the exchange in its Order:

| | | |
|---|---|---|
| Bank V Trader: | 4:00:51 pm: | have that my son |
| Bank V Trader: | 4:00:52 pm: | haha |
| Bank V Trader: | 4:00:56 pm: | v nice mate |
| HSBC Trader: | 4:04:53 pm: | that worked nice mate |
| Bank V Trader: | 4:05:44 pm: | big time mate |

143.   The Order also provided that "in a fourth chat room, [an] HSBC trader disclose[d]

his position with traders at other banks, prior to the close of the fix period. The traders starting at

3:36 p.m. share information about the size and direction of the net orders at the fix period." The

HSBC trader said that he was "lhs in cable at the fix" in a "good amount." Within seconds, a trader from another bank suggested that they get the "cable" up to "60/70 then bash the fck out of it" and then, after the close of the fix, commented "nice work gents".

144.   The CFTC also provided excerpts from a private chat room discussion in which a trader from another bank told an HSBC trader that another firm was "building" in the opposite direction to them and would be buying at the fix. The trader reported to the HSBC trader that he had taken action to net off against this order, "which would be in the opposite direction at the fix than [the trader's] and the HSBC trader's positions", and then congratulated each other on the successful manipulation as follows:

| | | |
|---|---|---|
| Bank W Trader: | 3:43:52 pm: | right ive taken him out |
| Bank W Trader: | 3:43:58 pm: | he paid me for 186 |
| HSBC Trader: | 3:44:09 pm: | ok thx |
| Bank W Trader 1: | 3:44:15 pm: | so shud have got rid of main buyer for u |
| Bank W Trader 1: | 3:44:58 pm: | im still a seller of 90 |
| Bank W Trader 1: | 3:45:06 pm: | give us a chance and ive paid a load of bro ha |
| Bank W Trader 1: | 4:05:03 pm: | yeah babyxx |
| Bank W Trader 1: | 4:05:11 pm: | [Bank U Trader] [Bank W Trader 1] combo boom |
| HSBC Trader: | 4:05:22 pm: | loved that mate |
| HSBC Trader: | 4:05:26 pm: | worked lovely |
| HSBC Trader: | 4:05:34 pm: | pity we couldn't get it below the 00 |

145.   The CFTC found that the HSBC trader's practice of communicating confidential information, including the size and direction of orders, and soliciting and directing other banks to follow suit was an effort to benefit his trading position "by jointly attempting to manipulate benchmark exchange rates," and that this conduct continued during 2011 and 2012, until the trader left HSBC in mid-2012. The CFTC also found that "at least one other HSBC FX trader received or disseminated information in chat rooms which involved confidential size and

direction orders and used this information to attempt to manipulate the benchmark exchange rate."

146.   The CFTC noted that in December 2012 HSBC banned multi-bank chat rooms for its FX personnel.

147.   Because of this activity, the CFTC imposed $27-million penalty on HSBC and required it to implement remedial steps to stop the manipulative conduct at the bank in the future.

### 3.   CFTC's Order Related to J.P. Morgan

148.   The CFTC found that J.P Morgan's FX traders' misconduct occurred over the course of 2010 through 2012. The Order also found that J.P. Morgan did not detect this illegal manipulation because of inadequate internal controls over the use of chat rooms, as well as supervisory failures.

149.   The CFTC Order provides An example of J.P. Morgan's FX traders' manipulation of the 4 p.m. fix through use of electronic messages just prior to the fix:

| | |
|---|---|
| JPMC Trader: | 3:51:21 pm: ok, I got a lot of euros |
| Bank X Trader: | 3:51:25 pm: ? |
| | 3:51:28 pm: you selling? |
| JPMC Trader: | 3:51:30 pm: yes |
| Bank X Trader: | 3:51:33 pm: now |
| | 3:51:35 pm: or pickun?[16] |
| JPMC Trader: | 3:51:39 pm: pick un |
| | 3:51:46 pm: u want it? ... [....] |
| Bank X Trader: | 3:52:24 pm: ill take it [Bank Y Trader] |
| | 3:52:26 pm: if u don't want it |
| JPMC Trader: | 3:52:39 pm: tell you what |
| | 3:52:42 pm: lets double team it 3:52:45 pm: how much u got |
| Bank X Trader: | 3:52:46 pm: ok |
| | 3:52:47 pm: 300 3:52:52 pm: u? |
| JPMC Trader: | 3:53:01 pm: ok ill give u 500 more |

---

[16] "Pickun" is a slang term for a fix order.

| | |
|---|---|
| Bank X Trader: | 3:53:05 pm: wow |
| | 3:53:06 pm: ok 3:53:08 pm: ha |
| | 3:53:09 pm:   cool ...[...] |
| JPMC Trader: | 3:53:20 pm: so we have 800 each |
| | 3:53:21 pm: ok |
| | 3:53:31 pm: but we gotta both do some at fix |
| | 3:53:36 pm: don't sell em all and take foot off haha |
| Bank X Trader: | 3:53:40 pm: i promise i will |
| JPMC Trader: | 3:53:47 pm: me too |

150.   At 4:00:14 p.m. the other trader reported that he was "hosed." The J.P. Morgan trader replied "ditto." Although these traders did not fully accomplish their goals to drive down spot EUR/USD prices, their manipulation at the fix created an artificial price EUR/USD spot and Futures FX price.

151.   Another example in the CFTC's Order exposed a J.P. Morgan FX trader's coordination with a trader from another bank ("Bank W") to manipulate the EUR/USD. These discussions began at 3:43 p.m., in advance of the London Fix. After confirming that both banks had a net buy order for Euros, the J.P. Morgan trader offered to transfer its net buy order to the trader at the other bank. In response, the second trader stated that he would "prefer we join forces." The J.P. Morgan trader enthusiastically responded, "perfick . . . lets do this...lets double team them," to which the other trader answered "YESssssssssss." Following the close of the fixing window, the other trader stated "sml rumour we haven't lost it" to which the J.P. Morgan trader enthusiastically responded "we do dollarrr."

152.   The CFTC's Order noted J.P. Morgan banned persistent multi-bank chat rooms for its FX personnel in December 2013 after commencing an internal investigation of possible misconduct by its FX traders relating to FX benchmarks in June 2013.

153.   Because of its misconduct, the CFTC penalized J.P. Morgan $310 million and required it to implement numerous remedial steps to stop the manipulative conduct at the bank going forward.

#### 4. CFTC's Order Related to RBS

154.   In its Order, the CFTC found that RBS's FX traders' misconduct occurred over the course of 2009 through 2012, and went undetected because of RBS because of lax internal controls over the use of electronic chat rooms, as well as supervisory failures.

155.   The CFTC Order showed how a RBS trader tipped off other banks that RBS had a client order to sell the GBP/USD currency pair, or "betty", at the 4 pm. fix:

| | | |
|---|---|---|
| RBS Trader: | 15:45:35: | im getting abt 80 quid now....fixing |
| Bank U Trader: | 15:45:54: | my ny 100 quid |
| RBS Trader: | 15:51:19: | getting more than u now [Bank U Trader] betty |
| Bank U Trader: | 15:51:26: | ok thx |
| Bank W Trader: | 15:52:23: | nice job gents |
| Bank U Trader: | 15:54:16: | [Bank V Trader], just matched with[Bank 1] and [Bank 2] for 100, still lsh in about 140 |
| RBS Trader: | 15:54:26: | cool ... |
| Bank Z Trader: | 16:00:58: | I don my hat ... |
| RBS Trader: | 16:01:08: | what a job |
| Bank Z Trader: | 16:01:23: | well done lads |
| Bank W Trader: | 16:01:28: | bravo |
| RBS Trader: | 16:07:03: | 1.6218..nice |
| Bank U Trader: | 16:07:33: | worked ok that one... |

156.   The Order also contains an example detailing a RBS FX trader's coordination with a trader from two other banks, to manipulate the price of Australian Dollars (AUD) and New Zealand Dollars (NZD):

| | | |
|---|---|---|
| Bank T Trader: | 15:43:32: | buying aud and nzd at the fix |
| RBS Trader: | 15:43:43: | Tkx |
| Bank T Trader: | 15:43:52: | ntg big |
| RBS Trader: | 15:43:59: | Im buying 50 aud can do yours if you want |
| Bank T Trader: | 15:45:13: | ok ... 60 plse ... **** |
| RBS Trader: | 15:45:56: | Great |
| Bank P Trader: | 15:50:00: | I need to buy 25 aud at the fix too...any int? more ammo for you.... ? |
| RBS Trader: | 15:50:21: | sure [Bank P Trader] |
| Bank P Trader: | 15:51:24: | cool all your [Bank V Trader] |
| RBS Trader: | 15:51:46: | Buying 220 now |
| Bank P Trader: | 15:51:57: | good luck |
| Bank T Trader: | 15:52:20: | load up your 50 offrs ... |

| Bank P Trader: | 15:53:14: | ill do those ones if you want |
| RBS Trader: | 15:53:19: | haah |
| Bank T Trader: | 15:53:20: | ur fkg [Bank V Trader], ramp it |
| Bank T Trader: | 16:00:41: | nice one ***** |
| Bank P Trader: | 16:00:56: | look at you!...-well done mate ... |

157.   The CFTC determined that the traders at the other banks encouraged the RBS trader to "build a larger position" or to "ramp it" prior to the fix.

158.   The Order also provides that after receiving a client complaint in October 2010 related to the sharing of order information and receiving internal inquiries in November 2011 about whether it was appropriate to share information with other banks and/or clients, RBS restricted the use of multi-bank chart rooms in August 2012.

159.   Because of its misconduct, the CFTC imposed a penalty of $290 million on RBS and required it to implement numerous remedial steps to stop the manipulative conduct at the bank going forward going forward.

### 5.   CFTC's Order Related to UBS

160.   The CFTC found that UBS, from 2009 to 2012 sought to benefit its own or other banks' trading positions by manipulating or aiding the manipulation of FX benchmark rates. This activity went undetected in part because of inadequate internal controls and supervision.

161.   In one example, a UBS trader and a trader at another bank "coordinated their trading to attempt to manipulate the WM/R 4 p.m. fix by exchanging their client fixing orders and information relating to the type of clients buying." The CFTC provided the following excerpts from the traders' discussions:

| Bank V Trader: | 15:57:45 | come on [UBS Trader] we can do this |
| | 15:57:50 | fix it at 07 |
| UBS Trader: | 15:57:54 | ha |
| | 15:58:55 | keep seeing citi on the bid |
| | 16:00:50 | nice work |

162.   The CFTC also quoted traders for UBS and three other banks exchanging positions in a chat room in advance of the London Fix. Once the four traders determined they were all the same direction, one trader asked if "we gonna be able to get it to 05" to which another trader responded "is that the troyal fkn we [sic]." After the fixing window closed the third trader said "nice call," and, according to the CFTC "the chat room members gave their 'scores' or profits from the fix. The chat room members each claimed they made between $60,000 and $220,000."

163.   Because of its misconduct, the CFTC imposed a penalty of $290 million on UBS and required it to implement numerous remedial steps to stop the manipulative conduct at the bank going forward.

### 6.   CFTC's Order Related to Barclays

164.   With respect to Barclays, the CFTC found that Barclays FX traders used chat rooms as vehicles through which they could manipulate certain FX benchmark rates, including the WM/Reuters London Fix.[17]

165.   "[I]n their attempts to manipulate certain benchmarks (up or down), Barclays FX traders exchanged the size and direction of the bank's net orders with FX traders at other banks and used this information to attempt to coordinate trading strategies."

166.   According to the CFTC Order, some examples of Barclay's misconduct include:

167.   "In one chat, a Bank Y Trader and a Barclays trader coordinated their trading in an attempt to manipulate a WM/R 4 p.m. London fix. At 3:43:50, the Barclays trader asked the Bank Y trader whether he needed to buy Euros in the market in the forthcoming fix. The Bank

---

[17] *See*
http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfbarclaysborder052015.pdf.

Y trader responded that he had a net buy order for the fix, which he subsequently confirmed as totaling 105 million. At 3:44:04, the Bank Y trader offered to transfer that net buy order to the Barclays trader. The Barclays trader replied 'maybe' and then stated that he had a net buy order for 150 million."

168.   "The traders had the following exchange:"

> Barclays Trader: I'd prefer we join forces
> Bank Y Trader: perfick
>                   Let's do this . . .
> Bank Y Trader: lets double team them
> Barclays Trader: YESsssssssssssss

### C.      FCA Settlements with Citibank, HSBC, JP Morgan, RBS, and UBS

169.   On November 11, 2014, the FCA entered into Final Notices of settlements of enforcement actions taken against Citibank, HSBC, J.P. Morgan, RBS and UBS in connection those banks' collusion to manipulate FX spot prices and benchmark rates. The FCA found that the banks had violated the FCA's Principles for Businesses in the period from January 1, 2008 to October 15, 2013, and imposed fines totaling £1,114,918,000 ($1.7 billion).

170.   The FCA Final Notices further determined that G10 FX traders at each of the banks attempted to manipulate the key benchmarks, including WM/Reuters and/or the European Central Bank ("ECB") fix rates, for their own benefit; attempted to trigger clients' stop loss orders for their own benefit (and to the detriment of clients and other market participants); and shared confidential client information with traders at other firms, including client identities and order positions and the size and direction of the banks' net orders at a forthcoming fix. These FX traders perpetrated their collusive trading schemes typically through electronic messaging, including chat rooms, with exclusive membership among a close, tight-knit group of G10 spot FX traders at different banks.

43

171.   The FCA found that this collusion "provided these traders with more information than they would otherwise have had about other firms' client order flows and thus the likely direction of the fix."

172.   The FCA identified certain practices of FX traders to carry out their market manipulation, including:

- Netting off orders with traders outside the chat room in order to reduce the volume of orders held by third parties that might otherwise be transacted at the fix in the opposite of the desired direct—known by traders as "taking out the filth" or "clearing the decks."[18]
- Transferring orders to a single trader within the chat room thereby consolidating these orders in the hands of one trader, a practice referred to by traders as "giving you the ammo."[19]
- Transacting with traders outside of the chat room in order to increase the volume of orders held by them in the direction favored by the chat room members, a process known as "building."[20]
- Increased the volume traded at the fix in the desired direction in excess of the volume necessary to manage the risk associated with the firms' net buy or sell orders at the fix, a process known within the market "overbuying" or "overselling."[21]

   *1.    The FCA's Settlement with Citibank*

173.   The FCA imposed a fine of £225,575,000 ($348 million) on Citibank.

174.   The FCA's findings of Citibank's manipulative conduct included an incident where Citibank attempted to manipulate the ECB fix in the EUR/USD currency pair in order to increase its profits. In this example, Citibank had net client buy orders and would profit if it was able to move the ECB rate upwards. Minutes ahead of the ECB fix, traders at five different banks inappropriately disclosed to each other via chat rooms specific details about their net orders. Citibank's net buy order associated with fix orders for clients was EUR 83 million.

---

[18] *See, e.g.*, http://www.fca.org.uk/static/documents/final-notices/final-notice-citi-bank.pdf
[19] *See id.*
[20] *See id.*
[21] *See id.*

However, in order to manipulate the fix, Citibank actively sought to increase the volume of EUR that it would buy for the fix by trading with other firms via chat room agreements and communications. As a result, Citibank was able to build its trading volume to EUR 542 million to buy at the fix, which the FCA found was "well above that necessary to manage Citi's risk associated with net client orders at the fix."

175.   To execute this manipulation, Citibank placed four buy orders on the EBS trading platform, each with increasing size and price, artificially moving the price up, to the benefit of the conspirators' buy positions. According to the FCA, Citibank purchased EUR 374 million, which accounted for 73% of all EBS purchases. The FCA found that Citibank's trading on this occasion in EUR/USD generated a profit for Citibank of $99,000.00.

176.   Chat room traders heralded Citibank's manipulative trading as "impressive," "lovely" and "cnt teach that", to which Citibank's trader modestly responded "yeah worked ok."

177.   In its investigation, the FCA also uncovered instances within Citibank's G10 FX spot trading operations of traders engaging in manipulative trades to trigger client stop loss orders at rates higher than Citibank had purchased the currency in the market.

### 2.   *The FCA's Settlement with HSBC*

178.   The FCA imposed on HSBC a fine of £216,363,000 ($334 million).

179.   The FCA's Final Notice sets for specific examples of conduct, including one incident in which HSBC attempted to manipulate the WM/Reuters Rate fix in the GBP/USD currency pair. In this example, HSBC had net client sell orders at the fix and would profit if it was able to move the WM/Reuters rate lower. HSBC's profits on this particular trade hinged upon HSBC selling GBP/USD at a rate higher in the market than the fix rate at which it bought GBP/USD.

180.   According to the FCA, in order to accomplish this desired price movement, during the period between 2:50 p.m. and 3:44 p.m. (in advance of the 4:00 p.m. London Fix), traders at four different banks, including HSBC, inappropriately disclosed to each other via chat rooms specific details about their net orders to determine their trading strategies.

181.   The FCA Final Notice provides the following details of this manipulation:

- First, HSBC and another trader at "Firm A" participated in a one-to-one chat disclosing net GBP/USD sell positions of GBP 400 million for HSBC and GBP 130 million for the other firm, which grew to GBP 150 million prior to the close. When HSBC's FX trader learned of the GBP 150 net sell position of the other trader, he stated "lets go" and received a reply of "yeah baby", which the FCA understands to refer to the possibility of these traders coordinating their actions to attempt to manipulate the GBP/USD London Fix downward.

- Next, at 3:28 p.m., in a group chat, including HSBC, the trader at Firm A solicited others with sell orders at the fix by commenting "hopefulyl [hopefully] a fe wmore [sic] get the same way and we can team whack it".

- Contemporaneously, at 3:28 p.m., HSBC's FX trader chatted one-to-one with a firm from a different bank, "Firm C", notifying him that he had net client sell orders of GBP 300 million at the fix and asking him to do some "digging" for others in the same direction at the fix. The trader from Firm C responded that he had GBP 83 million at the fix.

- A participant in the group chat referred to by the FCA as "Firm B" then confirmed to the other traders at 3:36 p.m. that he had net sell orders of GBP 40 million at the fix.

46

▪ Also at 3:36 p.m. a participating trader from "Firm D" commented that he had no fix orders at that time, but that he expected Firm A, which then held GBP 170 million, to "bash the fck out of it".

▪ At 3:38, HSBC's FX trader noted in a chat room that included Firms A, C and D as participants, that HSBC had GBP sell orders at the fix in a "good amount".

▪ Later in the same manipulative trading conversation, at 3:42 p.m., in a one-to-one chat, Firm A warned HSBC that a firm that was not participating in the group chat room, referred to by the FCA as "Firm E," was building a position in the opposite direction to them and would be buying at the fix.

▪ Within minutes, at 3:43 p.m., Firm A informed HSBC's FX trader that he had taken out some of Firm E's orders by netting them with Firm A's own sell orders, commenting to HSBC "taken him out . . . so shud have giot rid of main buyer for u...im stilla seller of 90 . . . gives us a chance." The FCA found that this was an example of Firm A "clearing the decks" for manipulation of the fix. The FCA's Final Notice further states that this comment is considered by the FCA as referring to the belief by Firm A that Firm E would no longer be transacting orders in the opposite direction of HSBC at the fix, and that Firm A still held GBP 90 in sell orders to trade at the fix and participate in the unlawful coordinated behavior and benefit from the manipulation.

182.   The FCA found that during "the period from 3:32 p.m. to 4:01 p.m., HSBC sold GBP 381 million on Reuters and other trading platforms." Specifically, GBP 70 million, or 18% of this volume, was sold by HSBC in advance of the 60 second fix window around 4:00 p.m., and from 3:32 to the start of the fix window, "the GBP/USD rate fell from 1.6044 to 1.6009." In

the first 5 seconds of the fix window, in 9 separate orders, HSBC sold an additional GBP 101 million, and the "bid rate fell from 1.6009 to 1.6000". The rate continued to fluctuate between 1.60000 and 1.65005, as HSBC continued to enter offers throughout the fix window, selling a total of "GBP311 million during the fix window on Reuters and other trading platforms." As a result of these actions, WM Reuters published the London Fix rate for GBP/USD at 1.6003.

183.   Reflecting the impact of the price manipulation over the approximately 30 minutes preceding the setting of the 4:00 p.m. London Fix, the FCA concluded that "[d]uring the period from 3:32 pm to the start of the fix window, the GBP/USD rate fell from 1.6044 to 1.6009" and that HSBC's early trades before the fix window opened were "designed to take advantage of the expected downwards movement in the fix rate following the discussions within the chat rooms described above." The FCA further found that HSBC's orders during the fix window constituted 51% of the volume sold on Reuters in the GBP/USD currency pair, and with HSBC, Firms A, B and C combined, the selling volume constituted "63% of selling during the fix window." HSBC's trades of GBP/USD on this particular occasion generated a profit of $162,000 for HSBC.

184.   After the close of the fix, the FCA found that traders congratulated one another in the chat room on the success of their collaborative manipulation of the GBP/USD rate, touting "nice work gents . . . I don my hat", "Hoory nice team work", bravo..cudnt been better" and "have that my son . . . v nice mate" and "don't mess with our ccy [currency]". In response to one of the traders' comments that "there you go...go early, move it, hold it, push it", HSBC's FX trader responded "loved that mate...worked lovely...pity we couldn't get it below the 00" and "we need a fre more of those for me to get back on track this month".

185.   In its investigation, the FCA also uncovered instances within HSBC's FX trading operations of traders engaging in manipulative trades to trigger client stop loss orders at rates higher than HSBC had purchased the currency in the market, thereby profiting. Chat room conversations demonstrated trading to intentionally trigger client stop loss orders, such as "going to go for broke at this stop...it is either going to end in massive glory or tears" and "just about to slam some stops". The FCA also reported that HSBC responded to a request from a colleague about whether client stop loss orders were a "pain" for the traders with comments that "nah love them . . . free money" and "we love the orders...always make money on them".

2.      *The FCA's Settlement with JP Morgan*

186.   The FCA imposed a fine of £222,166,000 ($343.3 million) on J.P. Morgan.

187.   The FCA's Final Notice provided as an example of misconduct an instance where J.P. Morgan and another bank ("Firm A") colluded to manipulate the 4:00 p.m. London Fix in the EUR/USD currency pair. The FCA set out the mechanics of the manipulation. After their initial exchange of net position information, the FCA found that "[alt 3:46pm, Firm A then states 'I'd prefer we join forces'. J.P. Morgan responded 'perfick...let's do ths...lets double team em." Firm A replied "YESsssssssssss."

188.   According to the FCA, J.P. Morgan then spent the period between 3:47 p.m. and 3:51 p.m. trading with other third parties to conduct trades that would increase J.P. Morgan's net buy position in EUR at the upcoming WM/Reuters fix window. Subsequently, between 3:52 p.m. and the opening of the fix window at 3:59:30 p.m., J.P. Morgan and the other bank executed manipulative trades that "were designed to take advantage of the expected upward movement in the fix rate". During the first five seconds of the fix window, the conspirators first

bought substantial EUR positions, and then continue to buy smaller orders during the remaining portion of the fix window.

189.   Collectively, J.P. Morgan and the other bank's trading accounted for 41% of the volume of EUR/USD bought during the fix. This manipulative scheme successfully increased the EUR/USD rate from 1.3957 at the start of the fix to 1.39605 once the fix rate was published. In response to its success, J.P. Morgan boasted, "we . . . do . . . dollarrr". Moreover, the following day, J.P. Morgan's trading partner at Firm a boasted to another bank that "we were EPIC at the [WMR] fix yest . . . i dragged [J.P. Morgan] in , we covered all the bases b/w us".

190.   The FCA also uncovered instances within J.P. Morgan's G10 FX spot trading business of traders engaging in manipulative trades to trigger client stop loss orders at rates higher than J.P. Morgan had purchased the currency in the market, thereby profiting.

       *3.*     *The FCA's Settlement with RBS*

191.   The FCA imposed a fine of £217,000,000 ($335.3 million) on RBS.

192.   The FCA Final Notice included an egregious example of how RBS attempted to manipulate the WM/Reuters fix in the GBP/USD currency pair. In this example, RBS had net client sell orders and would profit if it was able to move the WM/Reuters lower. To accomplish this desired movement, between 3:22 p.m. and 3:54 p.m. (i.e., shortly before the 4 p.m. London Fix), traders at four different banks (including RBS) inappropriately disclosed to each other via chat rooms specific details about their net orders. After learning that one bank had a net sell order at 3:22 p.m., RBS set upon a course of "building" the volume of GBP it would sell at the fix through a series of transactions with other firms. At one point during this period, client orders briefly gave rise to a net buy order. RBS then acted to reverse this course. In all, RBS's net sell orders associated with client fix orders was GBP 202 million, but the volume of

currency it needed to sell at the fix after its collusive trading increased to GBP 399 million, which the FCA found was "well above that necessary to manage [RBS's] risk associated with net client orders."

193.   To carry out this manipulation, after disclosing at 3:51 p.m. in a separate chat room with three separate firms that "we getting a lot betty [GBP] at the fix," RBS then proceeded to place a series of orders on the Reuters trading platform, each with increasing size and declining price. During the fix period, the CFTC found that RBS sold GBP 182 million, or 32% of the sales in GBP/USD on the Reuters platform; and when combined with one of its confederates, that their sales equaled 41% of total GBP/USD sales on the platform.

194.   As a result of this manipulation, the WM/Reuters published the fix rate for GBP/USD at 1.6218. Chat room traders praised RBS's manipulative trading by noting, "I don my hat", "welld one [sic] lads", "bravo", and by simply stating "[RBS] is god". Meanwhile, RBS acknowledged that the fix price was "nice" and RBS's confederates quipped, "we fooking killed it right... [Firm C], myself and RBS".

195.   In its investigation, the FCA also uncovered instances within RBS's G10 FX spot trading operations of traders engaging in manipulative trades to trigger client stop loss orders at rates higher than RBS had purchased the currency in the market, thereby profiting. For example, the FCA uncovered one chat wherein a RBS trader requested that a trader at another firm attempt to trigger a RBS client's stop loss order by stating, "HIT IT . . . I'm out of bullets haha".

     *4.*     *The FCA's Settlement with UBS*

196.   The FCA imposed a fine of £233,814,000 ($361 million) on UBS.

197.   The FCA found that manipulative misconduct at the bank's G10 FX spot trading operations occurred despite the fact that UBS had received whistleblower reports between

November 2010 and December 2012 which alleged misconduct on the part of FX traders, and specifically stated that "UBS FX traders were, amongst other things, engaging in improper trading in collaboration with unspecified third parties, disclosing client confidential information and trading on that information." According to the FCA, UBS failed to investigate these issues raised by the whistleblower.

198.   Further, despite UBS being on notice about misconduct as a result of the LIBOR investigation, the bank failed to implement adequate controls to address the root causes at issue in the FCA's investigation related to its G10 spot FX trading business. The FCA also uncovered instances where certain of those at UBS who were responsible for managing front office matters. were not only aware of, but at times were also involved in, the misconduct at issue.

199.   The FCA Final Notice includes chat room excerpts where, for example, a UBS trader raised concerns with allowing a new trader to join the chat room. The UBS trader checked with the other traders, including those at Citigroup and J.P. Morgan, in the chat room and asked "are we ok with keeping this as is [if new trader joins] . . . & risk sharing?" and in that same discussion, another trader in the group expressed his view that they "don't want other numpty's in mkt to know [about information exchanged within the group], but not only that is he gonna protect us like we protect each other...".

200.   The Final Order also includes an example of traders at four banks, including UBS, manipulating the ECB fix on the EUR/USD currency pair. According the FCA, these traders "inappropriately disclosed to each other via a chat room details about their net orders ... in order to determine their trading strategies." In a period of approximately 40 minutes preceding the ECB fix, these traders shared confidential information regarding efforts to build their net sell orders. At 12:48 p.m. one of the firms (designated by the FCA as "Firm A")

reported that its net sell orders had been reduced to EUR 100, but that it was "... hopefully taking all the filth out for u...". The FCA understood this to mean that Firm A had netted off part if its net sell orders with smaller buy orders held by third parties, which might otherwise have traded in the opposition direction at the fix.

201.   According to the FCA:

At 1:02pm, Firm A disclosed that it had sold EUR25 million to a client in a transaction separate to the fix but would remain EUR25 million short ("lose... shet [i.e. 25 million] though match dont buy"). The Authority considers that this statement referred to Firm A's intention not to buy this amount of Euros in the market immediately, but to take advantage of the anticipated downwards rate movement at the fix by only buying when the rate had dropped.

202.   The FCA Order provides other excepts from chat room conversations among these traders related to this manipulation and found:

The information disclosed between UBS and Firms A, B and C, regarding their order flows was used to determine their trading strategies. The consequent "building" by UBS and its trading in relation to that increased quantity at the fix were designed to decrease the ECB fix rate to UBS's benefit. UBS undertook the selling of Euros prior to the 1:15pm ECB fix in anticipation that the fix rate at which it would buy Euros would be lower than the average rate at which it had sold. The placing of a large sell order by UBS immediately prior to 1:15pm was designed to achieve this outcome. UBS's trading in EUR/USD in this example generated a profit of USD513,000.

203.   The FCA quoted comments by the other traders congratulating the UBS trader on their successful manipulation of the ECB fix, stating: "hes sat back in his chaoir [sic]...feet on desk...announcing to desk...that's why i got the bonus pool" and "yeah made most peoples year".

204.   In its investigation, the FCA also uncovered instances within UBS's G10 FX spot trading operations of traders engaging in manipulative trades to trigger client stop loss orders in a manner that benefited UBS to the detriment of their clients. For example, one UBS trader

commented in a chat room "i had stops for years but they got sick of my butchering" and, at another time described himself as "just jamming a little stop here."

205.   The FCA is continuing to investigate manipulation of benchmark FX rates, including the WM/Reuters Closing Spot Rates, following the announcement of its November 2014 settlements.

### D.   *OCC Settlement of Enforcement Actions Against Citibank, J.P. Morgan and BofA*

206.   Nationally chartered banks, such as Citibank, J.P. Morgan and BofA, are under the regulatory jurisdiction of the OCC. On November 11, 2014, the OCC entered into Consent Orders with these banks in connection with their failure to supervise employee conduct in FX trading, including unlawful disclosure of customer orders and rate spreads and collusion to trigger trading actions potentially detrimental to customers and beneficial to the trader or bank. On November 12, 2014, the OCC announced that it had instituted enforcement actions against and fined Citibank, J.P. Morgan and BofA a total of $950 million for unsafe and unsound practices related to their FX trading businesses between 2008 and 2013. *See* OCC Press Release (Nov. 12, 2014).

207.   The OCC found that FX spot traders at Citibank, J.P. Morgan and BofA participated in group chat room discussions about "coordinating FX trading strategies to manipulate exchange rates to benefit the traders or the bank." The OCC found that during 2008 through 2013, Citibank, J.P. Morgan and BofA each was an active dealer in the G10 spot FX market. The OCC noted that the daily average turnover in G10 currency pairs constitutes approximately 75% of total FX turnover.

208.   The OCC found that FX spot traders at the banks participated in collusive activity between and among themselves and other banks.

209.   According to the OCC Consent Orders, manipulation of FX spot prices and benchmark rates by FX traders at Citibank, J.P. Morgan and BofA occurred and went undetected for years, including during 2008 through 2013. Their traders engaged in agreements and coordinated efforts and trading strategies to attempt to manipulate FX spot prices and benchmark rates. The traders participated in multibank chat rooms, where traders discussed plans and agreements to trade in advance of pending customer orders to benefit the banks, and with disregard for potential harm to customers. Citibank's, J.P. Morgan's and BofA's FX traders improperly shared confidential customer order flows and proprietary bank information, including FX price spreads.

210.   All Board members for each of the three banks stipulated and agreed to their bank's Consent Order with the OCC, and committed to overseeing a comprehensive FX compliance plan required by the OCC to ensure safe and sound banking practices.

### E.   FINMA Sanctions and Fines Levied Against UBS

211.   In October 2013, FINMA initiated an investigation into UBS's conduct in the FX spot market, which it concluded on November 12, 2014.

212.   FINMA uncovered misconduct that included: (i) UBS traders repeatedly manipulated foreign exchange benchmarks to generate profits for UBS or for third parties; (ii) traders took actions which were in direct conflict with the interests of their clients and customers by (a) actively triggering client stop-loss orders to the advantage of UBS, (b) engaging in front-running, (c) engaging in risk-free speculation at the clients' expense, and (d) disclosing confidential client information to third parties; and (iii) traders engaged in deception regarding sales mark-ups and excessive mark-ups associated with an internal product of UBS.

213.   FINMA also found that UBS had: (i) insufficient risk assessment tools in place, including a lack of sufficient controls to prevent the simultaneous trading of proprietary and client accounts at the same time, leading to conflicts of interest; (ii) an incentive system in place in which a trader could earn compensation for trading which was on average triple the base salary, thereby incentivizing traders to engage in manipulative conduct; and (iii) no measures in place to prevent these inappropriate forms of trading. FINMA also found that UBS desk supervisors ignored the misconduct and/or failed to provide any oversight of the traders in order to prevent the misconduct.

214.   FINMA found that the use of electronic communication platforms or chat rooms, played a key role in UBS's improper business conduct.

215.   As a result of these violations, FINMA ordered UBS to pay CHF 134 million ($141 million). FINMA also mandated that trader compensation be limited for a period of two years and that UBS implement a special review process. In addition, FINMA initiated proceedings against eleven current and former high level executives at UBS to determine the level of their involvement.

### F.    *Additional Ongoing Governmental and Regulatory Investigations Regarding FX Manipulation*

216.   The New York Department of Financial Services ("NYDFS") opened an investigation of several banks in connection with FX rate market manipulation.  In a May 20, 2015 Order with the NYDFS, Barclays agreed to pay a civil monetary penalty to the NYDFS in the amount of $485 million and to terminate certain employees who played a role in FX manipulation. The NYDFS's investigation into other related matters at Barclays remains open.[22]

---

[22] http://www.dfs.ny.gov/about/press/pr1505201.htm.  NYDFS Order available at: http://www.dfs.ny.gov/about/ea/ea150520.pdf.

217.   In a statement issued on July 21, 2014, the United Kingdom's Serious Fraud Office ("SFO") announced: "The director of the Serious Fraud Office has today opened a criminal investigation into allegations of fraudulent conduct in the foreign exchange market." The SFO is an independent agency that polices fraud, bribery and corruption.[23]

218.   EC's Competition Commissioner acknowledged its investigation of the FX market, and in particular, manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates, stating "We have internal information regarding possible manipulation of forex benchmarks." A person familiar with the EC's investigation stated that banks are queuing up to provide incriminating information "of startling quality."[24]

219.   On September 30, 2013, the Swiss Competition Commission ("Swiss WEKO") opened a preliminary investigation into manipulation of FX markets after learning about discussions about FX rates between banks. The Swiss WEKO stated, "Through discussions they are said to have manipulated various exchange rates."[25] On March 31, 2014, the Swiss WEKO provided additional details on its investigation, noting that it is investigating included Defendants UBS, Credit Suisse, J.P. Morgan, Citigroup, Barclays, and RBS, among others.[26] The Swiss WEKO's statement concluded, "There are indications that these banks went into anti-competitive agreements to manipulate price rates in foreign exchange trading."

220.   Germany's financial regulator, the Federal Financial Supervisory Authority ("BaFin"), is actively investigating manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates.[27] BaFin has made its FX investigation a top priority and

---

[23] *See* https://www.sfo.gov.uk/press-room/latest-press-releases/press-releases-2014/forex-investigation.aspx.
[24] *See* http://www.reuters.com/article/2013/12/05/eu-forex-probe-idUSL5N0JK2WQ20131205; http://www.ft.com/cms/s/0/99be70f4-b8ae-11e3-a189-00144feabdc0.html#axzz3c1XnLHxI.
[25] http://in.reuters.com/article/2013/10/04/banks-foreignexchange-idINWEA00DG620131004
[26] http://www.bloomberg.com/news/articles/2014-03-31/ubs-credit-suisses-fx-trading-probed-by-competition-commission.
[27] http://www.bloomberg.com/news/articles/2014-01-16/metals-currency-rigging-worse-than-libor-bafin-s-koenig-

moved it into a "special investigation" category. On January 16, 2014, BaFin's President stated the allegations of FX manipulation are "particularly serious because such reference values are based — unlike Libor and Euribor — typically on transactions in liquid markets and not on estimates of the banks."

221.   In October 2013, the Hong Kong Monetary Authority confirmed it was in cooperating with other regulators about their ongoing FX investigations, stating: "The Hong Kong Monetary Authority is aware of the allegations. We have been in communications with the relevant overseas regulators and following up with individual banks."[28]

222.   Singapore is Asia's largest FX center and the world's third largest FX trading hub. The Monetary Authority of Singapore confirmed that it "has been in touch with foreign regulators on the issue of alleged manipulation in the WM/Reuters foreign exchange benchmark rates. We stand ready to assist in their investigations."[29]

223.   The Australia Securities and Investment Commission ("ASIC") announced it commenced a probe into rigging by banks in the FX markets: "We are commencing a review to ascertain whether any misconduct relating to foreign exchange trading may have occurred in Australia. And whether from an Australian perspective ASIC has concerns about the foreign exchange market."[30]

224.   New Zealand's Commerce Commission also announced an investigation into the FX market.[31]

---

says.
[28] http://www.reuters.com/article/2013/10/16/us-hongkong-manipulation-idUSBRE99F06Z20131016.
[29] http://www.reuters.com/article/2013/10/24/markets-fx-rigging-singapore-idUSL3N0IE2XO20131024
[30] http://www.ft.com/intl/cms/s/0/51e79260-af26-11e3-bea5-00144feab7de.html#axzz3c1XnLHxI.
[31] http://www.comcom.govt.nz/the-commission/media-centre/media-releases/2014/commerce-commission-confirms-forex-investigation.

225.   The Financial Stability Board ("FSB") is an international body that was established in April 2009 as the successor to the Financial Stability Forum. The FSB coordinates regulation for the Group of Twenty ("G20") leading economies, organizing the work of national financial authorities and international standard setting bodies. The FSB includes all G20 major economies, FSF members, and the EC. The FSB set up a task force in 2013 to try to repair or replace tarnished financial benchmarks in the wake of LIBOR manipulation.[32]   On February 14, 2014, the FSB said it would review the FX benchmarks. The FSB has made a significant number of recommendations to bolster the integrity of the FX markets and related benchmark rates and fixes.

## VII.   Relationship Between FX Spot Prices and FX Futures

226.   The prices of FX Futures are tied to spot market prices and changes in spot market prices are immediately and correspondingly reflected in FX Futures prices. Thus, the Defendants' manipulation of FX spot prices is a manipulation of the price of the currency underlying the FX Futures contracts. The spot prices and benchmark exchange rates act  the reference price for futures contracts.

227.   The CFTC highlights this market fundamental in its settlements with each of Citibank, HSBC, J.P. Morgan, RBS and UBS regarding their manipulation of the FX spot price, where it found:

> Exchange rates in many actively traded CME foreign exchange futures contracts, including the Euro/U.S. Dollar (EUR/USD) futures, the U.S. Dollar/Japanese Yen (USD/JPY) futures, and British Pound Sterling/U.S. Dollar (GBP/USD) futures, track rates in spot foreign exchange markets at near parity after adjusting for the forward differential, or adding or subtracting "forward points."

---

[32] http://www.ft.com/intl/cms/s/0/38475fb8-95a2-11e3-9fd6-00144feab7de.html#axzz3c1XnLHxI.

228.   FX Futures contract prices are set at the date and time such contracts are entered into, whether they are opening contracts or offsetting, closing contracts. Over the course of a trading day, FX Futures prices reflect and are directly tied to corresponding FX spot prices. Because Defendants' manipulation caused FX spot prices to trade at artificial prices during certain intervals, Defendants' manipulation equally caused FX Futures contracts entered into during those intervals to trade at manipulated, artificial prices.

229.   As detailed herein, Defendants actively manipulated FX benchmark rates, such as the London Fix. Certain FX Futures are priced based on FX fixing rates. For example, as the CFTC found in its settlements with Citibank, HSBC, J.P. Morgan, RBS and UBS:

> FX benchmark rates, including the WM/R Rates, are used to price a variety of transactions including foreign exchange swaps, cross currency swaps, spot transactions, forwards, options, futures, and other financial derivative instruments.
> * * *
> Foreign exchange futures contracts are connected to FX benchmark rates. The CME Russian Ruble/U.S. Dollar (RUB/USD) futures contract, for instance, is a cash settled futures contract for which the final settlement rate, a component of the contract's price, is equal to the reciprocal of the EMTA Russian Ruble/U.S. Dollar benchmark rate.

230.   Defendants' manipulation of FX spot prices and FX benchmark rates therefore caused injury to FX Futures traders, like Plaintiff and the members of the Class, whose FX Futures contract prices were affected by or set at manipulated prices.

231.   As alleged herein, Defendants dominate the market for FX spot transactions and have the power collectively to control prices in that market. Because of the direct causal relationship between FX spot market prices and FX Futures prices (i.e., FX Futures prices respond rapidly to FX spot price changes), Defendants consequently have the power to control, and did control, prices in the FX Futures market.

232.   Defendants are, and were during the Relevant Period, horizontal competitors in both the market for FX spot transactions and in the FX Futures market. In the market for FX spot transactions, Defendants compete against each other on at least two levels: (1), Defendants compete against each other for business by offering clients access to the spot market at competitive bid/ask spreads; (2)  Defendants compete against each other as traders for their own accounts — including by seeking profits from taking net long or short positions — and to obtain the most beneficial positions at prices determined by, absent Defendants' collusion as alleged herein, competition with other traders.

233.   In the FX Futures market, Defendants compete against each other and other traders, as both proprietary traders seeking profits by taking net long or short positions, and also for the purposes of FX risk management by using futures and options to hedge FX exposures. In both cases (proprietary trading and hedging), Defendants seek to obtain the most beneficial futures contracts and options at prices determined by, absent Defendants collusion as alleged herein, competition with other traders.

234.   During the Class Period, Defendants traded FX spot contracts and other related derivative contracts, including exchange-traded FX Futures. By acting together, Defendants could and did control where FX spot prices and benchmark rates would be set on certain days and could impose artificial suppression or inflation of FX spot prices and benchmark rates to benefit their and their co-conspirators' related FX spot trading positions. Defendants' manipulation of the FX spot prices and FX benchmark rates, as alleged herein, injures competition. FX benchmark rates are prices determined by FX spot quotes and trades during a window of time, for example surrounding 4:00 p.m. London time for the London Fix, and thus reflect actual market activity. Defendants' collusive conduct interfered with the competitive

interplay of supply and demand and caused the FX spot prices and FX benchmark rates to be manipulated. This collusive, artificial manipulation of FX spot prices and benchmark rates had an immediate, direct, substantially certain and foreseeable corresponding impact on prices of exchanged-traded FX Futures.

235.   The injury suffered by Plaintiff and other members of the Class flowed directly from Defendants' collusive manipulation of FX spot prices and benchmark rates. Defendants' anticompetitive conduct had severe adverse consequences on competition in that Defendants artificially ensured advantageous market movements in the FX spot prices and FX benchmark rates by exchanging confidential customer information and agreeing to concerted traded strategies, such as front running, banging the close, and painting the screen, based on aggregate customer order flow information. As alleged herein, no one Defendant could accomplish systematic and continuing manipulation of FX spot prices and FX benchmark rates without coordinating with its rivals. Absent Defendants' knowledge of one another's confidential customer information, the conduct alleged herein would be a risky strategy. Defendants benefited from coordinating their market activities.

236.   Changes in spot market prices are immediately and correspondingly reflected in FX Futures prices. The direct harm suffered by Plaintiff and the members of the Class happened because the prices of FX Futures contracts are tied to FX spot prices and FX benchmark rates. As a result, Defendants' collusion to fix and manipulate prices in the FX spot market directly caused Plaintiff and members of the Class injury to their business or property, and actual damages, in the form of diminished profits or increased losses on their exchange-traded FX Futures or options on FX futures. Such antitrust injury to Plaintiff and Class members flowed directly from the anticompetitive nature and effects of Defendants' collusive conduct, which

replaced prices set by competition among horizontal competitors with prices set by Defendants'

collusive manipulation.

237.   The injury to Plaintiff and members of the Class is of the type the antitrust laws

were designed to prevent and flow from that which makes Defendants' acts alleged herein

unlawful.

## CLASS ACTION ALLEGATIONS

238.   Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of itself and all others similarly situated who bought or sold exchange-

traded FX futures contracts or options on FX futures contracts during the Relevant Period. The

"Class" is defined as:

> All persons or entities that held FX futures or options on FX futures whose daily cash
> flows were calculated based on any key FX benchmark rates such as London Fix or
> CME Daily Settlement Fix, or who bought, sold, or settled any exchange-traded FX
> futures contracts and options on FX futures contracts at or around the time of setting key
> FX benchmark rates such as London Fix or CME Daily Settlement Fix, or that was
> priced based in whole or in part on such benchmark rates between at least as early as
> January 1, 2008 and the present (the "Class Period").

> Excluded from the Class are the Defendants, officers, directors or employees of any
> Defendant; any entity in which any Defendant has a controlling interest; any affiliate,
> legal representative, heir, assign, parent, subsidiary and co-conspirator of any
> Defendant.

239.   Each Class member incurred costs, fees, and/or other expenses, as well as

diminished profits or increased losses, associated with transacting in exchange-traded FX

Futures or options on FX Futures during the Class Period. No member of the Class would have

consensually incurred the costs, fees, and/or other expenses associated with such transactions,

had such Class member known that he, she or it faced a risk of loss arising from collusive

manipulation of FX prices by the Defendants. Therefore, Defendants' conduct caused each

member of the Class injury when they incurred the costs, fees, and/or other expenses associated with such transactions during the Class Period.

## I.      The Class Meets the Requirements of Rule 23(a)

240.    The Class members are so numerous that joinder of all members is impracticable. While the exact number and identity of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds, or thousands, of individuals or entities that purchased, sold, or held relevant FX Futures during the Class Period at prices artificially affected by Defendants' wrongful conduct.

241.    There are questions of law and fact common to all Class members, which predominate over questions affecting only individual members of the Class, including, *inter alia*, the following:

a.      whether Defendants manipulated FX spot and/or FX benchmark rates;

b.      the nature and duration of the Defendants' manipulation of FX spot and/or FX benchmark rates;

c.      whether Defendants' manipulation of FX rates injected artificial prices into FX Futures traded on centralized exchanges;

d.      whether or to what degree Defendants participated in the FX Futures market;

e.      whether Defendants' conducted violated Section 22 of the CEA;

f.      whether Defendants' conduct acted to aid and abet violation of the CEA;

g.      whether Defendants conspired to manipulate FX spot and benchmark rates;

h.      whether Defendants combined, agreed, or conspired to suppress, fix, maintain, or stabilize FX spot and benchmark rates in violation of the antitrust laws;

i.      whether Defendants' unlawful conduct caused injury to the business or property

of Plaintiff and the Class;

j.      whether Plaintiff knew, or had any reason to know, of the conspiracy engaged in

by Defendants;

k.      whether the Defendants and their co-conspirators fraudulently concealed their

misconduct from Plaintiff and the members of the Class; and

1.      the appropriate measure of relief for the Defendants' violations of the

CEA and antitrust laws.

242.   Plaintiff's claims are typical of the claims of the Class members because its

claims have the same essential characteristics as the claims of the Class members and its claims

arise from the same course of conduct by Defendants. Defendants have acted in an unlawful

manner on grounds generally applicable to all members of the Class.

243.   Plaintiff will fairly and adequately protect the interests of the Class. Its claims are

common to all members of the Class and it has strong interests in vindicating Class members'

rights. There is no conflict of interest between Plaintiff and other members of the Class.

Plaintiff is represented by sophisticated class action counsel, experienced in complex antitrust

and commodities futures manipulation litigation.

## II.      The Class Meets the Requirements of Rule 23(b)

244.   The Class may be maintained pursuant to Rule 23(b)(1), (b)(2), (b)(3), and/or

(c)(4).

245.   Certification under Rule 23(b)(1) is appropriate because prosecuting separate

actions by or against individual class members would create a substantial risk that adjudications

with respect to individual Class members would, as a practical matter, be dispositive of the

interests of the other members not parties to the individual adjudications and would substantially impair or impede their ability to protect their interests.

246.   Certification under Rule 23(b)(2) is appropriate because Defendants acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

247.   Certification is also appropriate pursuant to Rule 23(b)(3) because the questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages.

248.   Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy in that, among other factors:

a.   The interests of Plaintiff and the Class in individually controlling the prosecution of separate actions are outweighed by the advantages of adjudicating the common issues of fact and law by means of a class action;

b.   Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would entail;

c.   The benefits of a class action, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action; and

d.  If individual members of the Class prosecuted separate actions, it would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

249.  In the alternative, or in addition to certification under Rule 23(b), Plaintiff seeks certification of Class members' claims under Rule 23(c)(4), which provides that an action may be brought or maintained as a class action with respect to particular issues.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' FRAUDULENT CONCEALMENT

250.  During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion and manipulation of FX spot prices and FX benchmark rates, as alleged herein, from Plaintiff and the Class members.

251.  The unlawful activity alleged herein was conducted in secret. Defendants conspired to manipulate FX benchmark rates, primarily the London Fix, to the benefit of Defendants and to the detriment of Plaintiff and the Class members, and they further conspired to keep their collusive and manipulative conduct secret. As a result, Plaintiff could not discover that he had suffered possible injury, at the earliest, prior to an article in Bloomberg dated June 12, 2013 that first disclosed possible FX price manipulation.

252.  Defendants concealed their anticompetitive actions by, *inter alia*, engaging in secret communications in furtherance of their conspiracy. These communications occurred within private chat rooms, instant messages, and through email, none of which was reasonably available to Plaintiff or the Class members.

253.  The chat rooms at issue were operated by the highest-ranking traders within Defendants' operations, and Defendants strictly limited access to the chat rooms. The substance of the conversations by specific Defendants occurring within these chat rooms was unknown to

Plaintiff until November 2014, when government investigations disclosed settlements and orders, which revealed, in part, the nature of Defendants' misconduct and the currencies involved, through the publication of limited excerpts from chat room conversations. Even then, these regulatory settlements and orders did not reveal the dates or other specifics regarding the FX manipulation by the settling Defendants.

254.   As a result, Plaintiff did not learn of the facts needed to commence suit against Defendants for the manipulative conduct alleged in this Complaint until Defendants and regulators publicly acknowledged their investigations and the scope thereof.

255.   The facts necessary for Plaintiff to formulate the basis of a complaint and satisfy applicable pleading standards remained within the exclusive control of Defendants, their co-conspirators, and the governmental regulatory authorities investigating the activity alleged herein.

256.   News articles relating to possible FX manipulation and the suspension or termination of FX traders did not identify the currency pairs involved in the manipulation, the parties to the manipulation, the dates of the manipulation, or provide substantial detail as to how the manipulation occurred.

257.   Plaintiff and the Class members have acted diligently in seeking to bring their claims promptly. Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiff from suing them for the manipulative activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

## COUNT I

### (Manipulation of FX Futures Prices in Violation of the CEA)

258.   Plaintiff incorporates the allegations in this Complaint by reference and reallege them as though fully set forth herein.

259.   The Relevant Exchanges have been designated by the CFTC as contract markets pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The Relevant Exchanges submit to the CFTC various rules and regulations for approval through which these exchanges design, create the terms of, and conduct trading in FX Futures. The Relevant Exchanges are organized, centralized markets that provide a forum for trading on-exchange FX Futures.

260.   Defendants and their co-conspirators, through the acts alleged in this Complaint, specifically intended to and did cause unlawful and artificial manipulation of FX spot currency prices and understood and knew to a substantial certainty, as active and sophisticated FX market traders (including as active FX Futures traders), that manipulation of FX spot prices would have a direct corresponding manipulative effect on FX Futures prices and would cause corresponding actual damages to Plaintiff and members of the class. Such consequences were thus fully and certainly foreseeable, and Defendants knowingly, intentionally, and/or recklessly caused such harm and injury. The acts of manipulation described in the complaint had no legitimate business purpose.

261.   Plaintiff and others who transacted in FX Futures transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, et seq., and as a direct result thereof were injured and suffered damages.

262.   Defendants' conduct caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

263.   By their intentional misconduct, Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of FX Futures to be artificial.

264.   Defendants' activities alleged herein constitute market power manipulation of the prices of FX Futures in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a). Defendants' extensive manipulative conduct deprived Plaintiff and other Class members of a lawfully operating market during the Class Period.

265.   Plaintiff and Class members paid artificial prices for their FX Futures, were deprived of a lawfully operating market free from manipulation, and are entitled to recover their actual damages resulting therefrom for the violations of the CEA alleged herein.

## COUNT II

### (Vicarious Liability for Manipulation of FX Futures Prices)

266.   Plaintiff incorporates the allegations in this Complaint by reference and reallege them as though fully set forth herein.

267.   Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

## COUNT III

### (Aiding and Abetting the Manipulation of FX Futures Prices)

268.   Plaintiff incorporates the allegations in this Complaint by reference and reallege them as though fully set forth herein.

70

269.   Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of other Defendants' manipulations of FX spot prices, and therefore of FX Futures prices, including by trading ahead, banging the close and painting the screen in connection with FX spot transactions, and willfully intended to assist these manipulations to cause the price of FX Futures to be artificial, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

270.   Plaintiff and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

271.   As a further direct result of the acts of Defendants, Plaintiff and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees and other expenditures, in a sum to be proven at trial.

**COUNT IV**

**(Manipulation by False Reporting and Fraud and Deceit in Violation of the CEA)**

272.   Plaintiff incorporates the allegations in this Complaint by reference and reallege them as though fully set forth herein.

273.   By their intentional and reckless misconduct, Defendants each violated Section 6(c)(1) of the CEA, as amended, 7 U.S.C. § 9, and caused prices of FX Futures and other derivatives contracts and derivatives to be artificial during the Class Period. Defendants delivered and caused to be delivered for transmission through the mails and interstate commerce, by multiple means of communication, including communications to electronic trading platforms, false or misleading or inaccurate reports concerning order and trade information that affect or tend to affect the price of FX spot contracts and benchmark prices and

FX Futures, which are commodities in interstate commerce, knowing, or acting in reckless disregard of the fact that such report was false, misleading or inaccurate.

274.   Under Section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC, which shall promulgate by not later than 1 year after July 21, 2010.

275.   In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a) (2011), which provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud, make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading.

276.   Unlawful manipulation under the CEA, as amended, and Rule 180.1 includes delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

277.   During the Class Period, Defendants used or employed manipulative or deceptive devices or contrivances, in connection with a contract of sale or purchase of currency exchanges in interstate commerce. This conduct included the making of untrue or misleading statements of

material facts, or omitting material facts necessary to make the statements made not misleading, such as:

    a.    Making untrue or misleading statements to influence FX prices reflected in trading platform databases and related WM/Reuters Rates, including the London Fix;

    b.    Failing to disclose, and omitting, that they entered pre-arranged transactions to move prices in a direction to benefit their own trading books;

    c.    Failing to disclose, and omitting, that they were unlawfully conspiring between and among themselves to manipulate, inter alia, FX spot and benchmark prices;

    d.    Failing to disclose, and omitting, that they were reporting bids, offers and transactions to move FX spot and benchmark prices uneconomically to benefit their trading positions;

    e.    Issuing statements and directly engaging in the acts alleged herein knowingly or with reckless disregard for the truth; and

Defendants also employed various other deceptive devices as described above.

278.   Defendants' conduct caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

279.   Plaintiff and the other members of the Class are each entitled to damages for the violations of the CEA alleged herein.

**COUNT V**

**(Violation of the Federal Antitrust Laws)**

280.   Plaintiff incorporates the allegations in this Complaint by reference and reallege them as though fully set forth herein.

281.   Defendants constituted and/or entered into a contract, combination or conspiracy in restraint of trade, i.e., to manipulate or fix prices of FX spot currency rates and/or FX benchmark rates, including the WM/Reuters Rates and related London Fix, during the Class Period in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

282.   During the Class Period, Defendants possessed market power in the setting of FX spot currency rates and FX benchmark rates, including the WM/Reuters Rates and the London Fix.

283.   The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and made artificial FX spot currency rates and FX benchmark rates, as well as FX Futures prices. Thus, both Defendants' conduct (agreed coordinated action to fix prices, thus diminishing the independent competitive action that competition assumes and demands) and the intended and actual effect of that conduct (to raise FX spot market and FX futures market prices above competitive levels and/or to suppress such prices to below competitive levels) was anticompetitive. As such, Defendants' conspiracy is a per se violation of the federal antitrust laws and an unreasonable and unlawful restraint of trade.

284.   Each of the Defendants acted, as alleged herein, intentionally and with full knowledge of the objective of their agreed and coordinated conduct to manipulate, peg, fix, inflate and/or suppress FX spot currency prices for their collective advantage. Additionally, each of the Defendants acted, as alleged herein, with knowledge to a substantial certainty, as active and sophisticated FX market traders, that their manipulation of FX spot market prices would have a direct and corresponding manipulative effect on FX Futures prices, and so each Defendant intended to manipulate, peg, fix, inflate and/or suppress not only FX spot currency

prices, but also FX futures prices. Further, each Defendant knew to a substantial certainty that such anticompetitive manipulation and fixing of prices in the FX futures market would cause harm and injury to FX futures market participants such as Plaintiff and members of the Class. Such consequences were thus fully and certainly foreseeable, and Defendants knowingly, intentionally, and/or recklessly caused such harm and injury.

285.   Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiff and all Class members.

286.   FX Futures are traded throughout the U.S. in interstate commerce and globally. During the Class Period, Plaintiff and members of the Class transacted in and/or held FX Futures at prices that were set and otherwise made artificial as a result of Defendants' unlawful acts.

287.   During the Class Period, Defendants acted in interstate commerce within the U.S.

288.   Defendants' contract, combination, and conspiracy unreasonably restrained trade and commerce, made artificial the prices of FX spot currency rates and/or benchmark FX rates, and caused misleading signals to be sent to market participants.

289.   As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property. Plaintiff and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

290.   Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(1), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and his counsel as Class counsel;

(B)    For a judgment awarding Plaintiff and the Class actual damages for Defendants' violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)    For a judgment awarding Plaintiff and the Class actual damages, in an amount to be trebled, for Defendants' violations of the Sherman Act, together with prejudgment interest at the maximum rate allowable by law;

(D)    For the issuance of an injunction against Defendants, preventing and restraining Defendants' violations of the Federal antitrust laws;

(E)    For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(F)    For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(G)    For such other and further relief as the Court may deem just and proper.

JURY DEMAND Plaintiff respectfully demands a trial by jury.

DATED:  June 23, 2015

LOUIS F. BURKE, P.C.

By: _/s/Louis F. Burke_____
       Louis F. Burke, Esq.
Leslie Wybiral, Esq.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:  (212) 682-1700
lburke@lfblaw.com
lwybiral@lfblaw.com

*Of Counsel*
*Pro Hac Vice Application(s) Pending*

Michael Brickman
mbrickman@rpwb.com
Richardson, Patrick, Westbrook &
Brickman, LLC
174 East Bay Street
P.O. Box 879
Charleston, SC  29401
Telephone: (843) 727-6500
Facsimile: (843) 727-3103

James C. Bradley
jbradley@rpwb.com
Nina Fields Britt
nfields@rpwb.com
Matthew A. Nickles
mnickles@rpwb.com
Richardson, Patrick, Westbrook &
Brickman, LLC
1017 Chuck Dawley Blvd.
Post Office Box 1007
Mount Pleasant, SC  29465
Telephone: (843) 727-6500
Facsimile: (843) 881-6183

*Attorneys for Plaintiff*